No. 88,765

ARTHUR E. NICHOLAS, Executor of the Estate of Sheryl A. Nicholas, Deceased, *Appellant,* v. RUBY E. NICHOLAS, *Appellee,* and SHERYL A. NICHOLAS, v. RUBY E. NICHOLAS.

(83 P.3d 214)

Opinion filed January 30, 2004.

*J. Eugene Balloun,* of Shook, Hardy & Bacon, L.L.P., of Overland Park, argued the cause, and *Celia K. Garrett, Kirsten Ehlen,* and *Brenda R. Mesker,* of the same firm, and *John R. Toland,* of Toland & Thompson, L.L.C., of Iola, were with him on the briefs for appellant.

*Ted E. Knopp,* of Ted E. Knopp, Chtd., of Wichita, argued the cause, and *Charles H. Apt, III,* of Apt & Apt, L.L.P., of Iola, was with him on the briefs for appellee.

The opinion was delivered by

LUCKERT, J.: Ruby Nicholas filed for divorce from Sheryl Nicholas and obtained an ex parte temporary restraining order prohibiting either party from disposing of assets. Knowing he was terminally ill, Sheryl created a new will, changed the beneficiary on his life insurance policy, made pay on death (POD) and transfer on death (TOD) designations on several accounts, and attempted to unilaterally sever joint tenancies. He also sued Ruby for invasion of privacy and trespass, alleging that she broke into his home and removed documents and financial records. Sheryl died 2 days before the divorce trial date.

Sheryl's executor filed suit against Ruby and, in an amended answer, she asserted claims against those named as beneficiaries on the accounts and insurance. The district court granted summary judgment in favor of Ruby, ruling that Sheryl's actions had violated the temporary restraining order and that titles to the accounts should remain as they existed at the time the restraining order was issued. The district court also ruled that the invasion of privacy action did not survive. On appeal, a majority of the Court of Appeals panel affirmed. This court granted the executor's petition for review.

The parties have not contested the Court of Appeals' rendition of the facts, which was largely based upon stipulations of the parties. As the Court of Appeals recited, on May 9, 2000, after more than 25 years of marriage and approximately 2 years of living separately, Ruby Nicholas filed for divorce from Sheryl Nicholas. Ruby obtained an ex parte temporary restraining order prohibiting either party from disposing of any asset of the parties "except in the normal course of business." Knowing that he was terminally ill, on July 18, 2000, Sheryl executed a will devising all of his property in equal shares to his children from a previous marriage, Arthur E. Nicholas and Susan A. Johnson, and naming Arthur as executor of his estate. During July 2000, Sheryl also executed a transfer on death (TOD) form designating Arthur and Susan as beneficiaries of his Van Kampen funds, a TOD form naming Arthur and Susan as beneficiaries of an Edward Jones account, and a pay on death (POD) form naming Arthur as beneficiary of a checking account at the Iola Bank and Trust Company (Iola Bank). In August 2000, Sheryl changed

the primary beneficiary of his Ameritas life insurance policy from Ruby to Arthur.

Sheryl then filed a cross-petition for divorce and a motion for an emergency divorce. He later filed a motion to sever the joint tenancy property he owned with Ruby. Finally, he sued Ruby for invasion of privacy and trespass, alleging that Ruby broke into his home and removed documents and financial records. Sheryl demanded the return of the documents and sued for damages in excess of $50,000.

The district court denied Sheryl's motion for an emergency divorce but granted his motions to file a cross-petition for divorce and to modify the restraining order. At the hearing, Sheryl's counsel reserved argument on the motion to sever the joint tenancies. Trial was set for October 3, 2000.

Meanwhile, the parties attempted to negotiate a settlement agreement. On September 27, 2000, Sheryl executed a property settlement and separation agreement which he believed was consistent with the terms of a previous offer made by Ruby. On September 29, 2000, Sheryl executed a revocable trust funded with all of his personal property and certain real property, with Arthur and Susan as equal beneficiaries.

Sheryl died on October 1, 2000, 2 days before the divorce trial date. Sheryl's will was admitted to probate on December 11, 2000, after Ruby withdrew her objections. Arthur, as executor of Sheryl's estate, filed suit against Ruby seeking delivery of one-half of the joint tenancy property and alleging that she had breached the settlement agreement by refusing to release that property. In her answer, Ruby acknowledged the existence of Sheryl's new will; however, she argued that most of the marital property was held in joint tenancy with right of survivorship and denied that Sheryl's actions succeeded in terminating their joint tenancies. Ruby also responded that she had neither approved nor executed the settlement agreement.

On April 13, 2001, Ruby filed an application to amend her answer and join Arthur and Susan as additional parties to the action. Ruby's amended answer stated a counterclaim and cross-claim against Arthur as executor and against Arthur and Susan as indi-

viduals. Ruby alleged that Sheryl's attempts to sever joint tenancy interests and his changing or naming beneficiaries on accounts and his life insurance policy violated the restraining order and were fraudulent under K.S.A. 33-201 *et seq.*, the Kansas Uniform Fraudulent Transfer Act. Ruby asked the district court to impose a constructive trust on those funds transferred by Sheryl "outside the normal course of business" to Arthur and Susan in violation of the restraining order.

Arthur opposed Ruby's motion, responding that the district court did not have personal jurisdiction over Susan or himself, as individuals. He argued that the district court did not have subject matter jurisdiction over the Van Kampen funds, the Edward Jones account, or the Ameritas life insurance policy because the funds were situated and paid from locations outside of Kansas to parties residing outside of Kansas. The Iola Bank checking account was in the possession of the special administrator and had not been disbursed. Further, Arthur maintained that Ruby claimed these four accounts in ongoing probate proceedings. There is no indication in the record that a hearing was held to address Ruby's motion.

Both parties filed motions for summary judgment on their respective claims. Ruby argued that Sheryl's actions did not sever the joint tenancies; Sheryl violated the restraining order when he made POD and TOD designations for the Van Kampen funds, the Iola Bank checking account, and the Edward Jones account; Sheryl further violated the restraining order by changing the beneficiary of his Ameritas life insurance policy; the proposed settlement agreement did not bind the parties because Ruby did not sign or execute it and, without her signature, the agreement violated the homestead laws of Kansas and the statute of frauds; and Sheryl's invasion of privacy claim did not survive his death.

Arthur's motion for summary judgment argued that the restraining order did not prohibit severance of the parties' joint tenancies; Sheryl acted properly in changing or designating beneficiaries on his life insurance policy and the various accounts at issue; the settlement agreement signed and executed by Sheryl was binding on the parties; and Sheryl's invasion of privacy claim survived his death.

On February 15, 2002, the parties signed a stipulation as to the joint or several ownership of Ruby and Sheryl's personal and real property as of the date of Sheryl's death. The stipulation indicates that the Edward Jones account and Iola Bank account were titled solely in Sheryl's name and that Sheryl was the policy holder on his Ameritas life insurance policy. The parties continue to dispute whether the Van Kampen funds were the sole property of Sheryl or were held jointly with Ruby.

In its March 14, 2002, order, the district court granted summary judgment in favor of Ruby, ruling: (1) Titles to the accounts should remain as they existed when the court issued the restraining order on May 9, 2000; (2) the settlement agreement did not bind the parties because it had not been agreed to by Ruby or approved by the court prior to Sheryl's death, which abated the divorce proceeding; and (3) Sheryl's invasion of privacy claim did not survive his death. Arthur timely appealed.

The Court of Appeals described the remaining procedural history of the case as follows:

"After deciding issues dispositive of Arthur's suit and Sheryl's invasion of privacy claim, the district court issued an order consolidating those two cases.

"Arthur filed a temporary restraining order on April 1, 2002. The district court issued its order on July 1, 2002, initially dissolving all prior restraints on the property. However, the order indicated that Ruby was restrained from 'gifting or spending one-half of the joint tenants' personal property.' Ruby was allowed to make estate plans and testamentary dispositions. Arthur was instructed to post a supersedeas bond in the amount of $152,674 to cover 125 percent of the value of the Ameritas life insurance policy and the Van Kampen fund which were at the disposal of Arthur or Susan.

"On July 15, 2002, Arthur filed a motion with this court to modify the July 1, 2002, stay of enforcement of the judgment entered by the district court. This court instructed the district court to hold a hearing for the limited purpose of determining: (1) whether an accounting of assets should be ordered; (2) whether property should be redistributed to restore the parties' interests; and (3) which measures, if any, should be taken to protect those interests during the pendency of the appeal. A hearing was held on August 29, 2002. The parties were unable to agree on a journal entry and the case was reset for a hearing on November 6, 2002.

"On November 7, 2002, the district court issued its order listing certain assets to be restrained from any direct or indirect acts intended to liquidate, retitle, transfer, or remove them from the jurisdiction of the court.

"In addition, the district court denied Arthur's request for restoration of Sheryl's one-half interest in the joint tenancy property. Counsel for the parties were ordered to immediately provide a copy of the district court's order to all entities and individuals to ensure that the orders concerned with the restrained property are followed." *Nicholas v. Nicholas*, 31 Kan. App. 2d 457, 462-63, 66 P.3d 929 (2003).

On appeal, a majority of the Court of Appeals panel affirmed the district court. *Nicholas*, 31 Kan. App. 2d at 459. In finding that Sheryl's actions violated the restraining order, the majority held: "A restraining order that restrains divorcing parties from disposing of any asset except in the normal course of business, restrains the parties from changing (1) beneficiary designations on insurance policies; (2) joint tenancies to tenants in common; (3) transfer on death designations; or (4) pay on death designations." 31 Kan. App. 2d at 465-66. Chief Judge Rulon concurred in part and dissented in part, stating that Ruby's claims against Arthur and Susan were not properly before the court because the trial court never ruled on Ruby's motion to amend her answer. Furthermore, according to Chief Judge Rulon, because Susan and Arthur were never properly made parties to the case, it violated due process for the trial court to issue an order altering title to property now held by them as nonparties. 31 Kan. App. 2d at 475-77.

### Standard of Review

This court's standard in reviewing summary judgment has been frequently stated:

" 'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied.' [Citation omitted.]" *Mitchell v. City of Wichita*, 270 Kan. 56, 59, 12 P.3d 402 (2000) (quoting *Bergstrom v. Noah*, 266 Kan. 847, 871-72, 974 P.2d 531 [1999]).

In this case, the material facts are not in dispute. Rather, it is the legal conclusions of the trial court and the Court of Appeals that are at issue. Our review of conclusions of law is unlimited. *Wear v. Mizell*, 263 Kan. 175, 177, 946 P.2d 1363 (1997).

*Did the Trial Court and Court of Appeals Err in Ruling That Transfers Made Contingent Upon One Spouse's Death Dispose of Marital Assets in Violation of a Restraining Order Issued Pursuant to K.S.A. 2002 Supp. 60-1607?*

Resolution of this case requires a determination of the effect of the restraining order and the statute authorizing the order, K.S.A. 2002 Supp. 60-1607(a)(1). The order provided that "neither party shall dispose of any asset of the parties except in the normal course of business." K.S.A. 2002 Supp. 60-1607(a)(1) authorizes the trial court to issue an interlocutory order after the filing of divorce to "[j]ointly restrain the parties with regard to disposition of the property of the parties and provide for the use, occupancy, management and control of that property."

Arthur, as executor of Sheryl's estate, first argues that the restraining order did not cover the accounts held in Sheryl's name only and the life insurance for which he was the policyholder and owner. The Court of Appeals noted that, pursuant to K.S.A. 2002 Supp. 23-201(b), all property owned at the commencement of a divorce action becomes marital property regardless of how it is titled and each spouse has a vested interest in the property, the extent of which must be determined and finalized by the court. *Nicholas*, 31 Kan. App. 2d at 465. Arthur asks this court to reject that view, arguing that K.S.A. 2002 Supp. 23-201(b) only creates a common ownership right in marital property "at the time of commencement by one spouse against the other of an action *in which a final decree is entered* for divorce, separate maintenance, or annulment." (Emphasis added.) Because no final decree was entered in this case, Arthur contends the statute does not apply. This argument ignores the fact that the restraining order, which was in effect pursuant to K.S.A. 2002 Supp. 60-1607, jointly restrained the parties from disposing of any asset of the parties. Further, as stated in *Cady v. Cady*, 224 Kan. 339, 581 P.2d 358 (1978):

"The filing for divorce, however, has a substantial effect upon the property rights of the spouses. At that moment each spouse becomes the owner of a vested, but undetermined, interest in all the property individually or jointly held. The court is obligated to divide the property in a just and equitable manner, regardless of the title or origin of the property. [Citations omitted.]

"We hold that the filing of a petition for divorce or separate maintenance creates a species of common or co-ownership in one spouse in the jointly acquired property held by the other, the extent of which is determined by the trial court pursuant to K.S.A. 1972 Supp. 60-1610(b). Except for those rights which vest by virtue of the filing of the divorce action, we in no way change the interest of one spouse in the property held by the other, or in the ability of the other spouse to convey, sell or give away such property." 224 Kan. at 344.

Applying this analysis, this court in *Wear* held that, under the facts of the case, life insurance "policies and the right to receive the insurance proceeds upon the death of the insured are marital property within the meaning of K.S.A. 23-201(b)." 263 Kan. at 179. Also, by operation of K.S.A. 2002 Supp. 23-201(b), the various bank and money market accounts at issue were within the marital estate for the purpose of dividing assets at the time of the divorce.

Next, Arthur, acting as executor of Sheryl's estate, cites the common definition of "dispose" and authority from other states to support his argument that Sheryl did not violate the restraining order because he did not "dispose" of any property. The Court of Appeals rejected this argument and concluded: "Even though the actual transfer would not take place until death, these items had value at the time the changes were made and such transfers affect the value of the marital estate. . . . The marital estate was diminished in value by these changes." *Nicholas*, 31 Kan. App. 2d at 470. The court also noted that K.S.A. 2002 Supp. 23-201(b) states that marital property is all property "owned" by the parties and "ownership" is defined to include the right to convey property to others. 31 Kan. App. 2d at 470.

Ruby, in asking us to affirm the Court of Appeals, and Arthur, in asking us to reverse the lower courts, quote portions of our decision in *Wear* as support for their positions. In *Wear*, William and Arilla Wear purchased two life insurance policies for Arilla naming William as beneficiary. After filing for divorce, Arilla changed the beneficiary on both policies from William to her par-

ents. Arilla was killed in a car accident before the divorce was finalized. No restraining order was issued as part of the divorce proceedings. The trial court ruled that William was not entitled to equitable relief and this court affirmed. The *Wear* court also noted that there was no restraining order, no property settlement agreement, and no divorce decree. The divorce action abated at Arilla's death. 263 Kan. at 180. And, where there is no divorce, there is no division of property. 263 Kan. at 184.

The *Wear* court recognized that the issue presented in this case, whether a standard restraining order prohibits a beneficiary change, has not been ruled upon in Kansas. *Wear* only held that where there was no restraining order at all, there was no prohibition against a change of beneficiary.

The *Wear* court noted William's reliance on *Willoughby v. Willoughby*, 758 F. Supp. 646 (D. Kan. 1990), a case involving similar facts, but found that case to be distinguishable. In *Willoughby*, the court held that a standard restraining order issued in a divorce prevented the husband from changing beneficiaries on his life insurance policy. This court stated: "The heart of the *Willoughby* decision is the finding that the beneficiary change violated the restraining order. All of the cases from other jurisdictions relied upon in *Willoughby* involved beneficiary changes that violated restraining orders or decrees." 263 Kan. at 182.

The *Wear* court noted that *Willoughby* involved a general restraining order while some cases from other jurisdictions involved restraining orders that expressly mentioned life insurance policies. The court noted the split of opinion in various jurisdictions as described in Annot., *Divorce and Separation: Effect of Court Order Prohibiting Sale or Transfer of Property on Party's Right to Change Beneficiary of Insurance Policy*, 68 A.L.R.4th 929, § 3. The court also quoted 4 Couch on Insurance 3d § 64.20 (1996):

" 'A temporary restraining order or injunction obtained in order to prevent an insured spouse from transferring property during pendency of divorce proceedings may also preclude the insured from changing beneficiary during pendency of suit, notwithstanding that no precise reference was made to life insurance policies. Any such temporary order is effective only as to actions taken after the order is made, and cannot invalidate the insured's prior change of beneficiary in ac-

cordance with the rights and procedures under the policy terms.'" 263 Kan. at 182.

However, the *Wear* court stated: "The better practice is to specifically reference a prohibition against a beneficiary change in a marital property restraining order." 263 Kan. at 181. Ruby and the Court of Appeals rely upon this statement to mean that an order specifically mentioning change of beneficiaries is not necessary.

Arthur particularly relies upon the concluding sentence of *Wear*, which states: "Absent entry of a K.S.A. 60-1607 order restraining the parties from changing beneficiaries on life insurance policies, K.S.A. 23-201(b) imposes no restrictions on either party from making such changes during the pendency of the divorce." 263 Kan. at 184. Arthur argues that this language means that a general restraining order does not prohibit the action he took and that to prevent a change of or designation of beneficiaries, one must seek a specific order.

Additionally, Arthur notes that many, if not most, of the out-of-state cases which have considered the issue have upheld beneficiary changes made while a general restraining order was in effect during the pendency of a divorce. See *Gorman-English v. Estate of English*, 849 P.2d 840, 843 (Colo. App. 1992) (change of beneficiary designation on life insurance policy not a conveyance or disposal of marital assets in violation of preliminary injunction; only cash surrender value of policy was frozen by injunction). *Gleed v. Noon*, 415 Mass. 498, 500-01, 614 N.E.2d 676 (1993) (change of life insurance beneficiary not a conveyance, transfer, or disposal of proceeds; no violation of temporary restraining order); *Bell v. Bell*, 896 S.W.2d 559, 562, 565 (Tenn. App. 1994) (wife as prior beneficiary had mere expectancy in decedent's life insurance policies; restraining order entered in divorce proceedings did not prohibit beneficiary change); *Lindsey v. Lindsey*, 342 Pa. Super. 72, 79, 492 A.2d 396 (1985) (change of beneficiary designation on life insurance policy not a conveyance or disposal of marital assets in violation of preliminary injunction; only cash surrender value of policy was frozen by injunction).

In a variation on these cases, some courts have held that, even if the beneficiary change violated a restraining order, imposition of

a constructive trust is not warranted absent some kind of uncon-
scionable or wrongful conduct. *E.g.*, *Wilharms v. Wilharms*, 93
Wis. 2d 671, 679-80, 287 N.W.2d 779 (1980) (temporary restrain-
ing order did not specifically mention insurance policy and hus-
band may have thought he was acting properly in changing bene-
ficiary; "[e]ven so, if it can be shown that he changed beneficiaries
in the policies in order to defraud, or otherwise unconscionably
deprive his wife of the policy proceeds, then his actions may war-
rant the imposition of a constructive trust"); *Balfany v. Balfany*,
239 Neb. 391, 398, 476 N.W.2d 681 (1991) ("violation of a re-
straining order, standing alone, is insufficient for imposition of a
constructive trust on property which is subject to the restraining
order").

On this issue, the United States District Court of Kansas has
stated:

"[T]he court does not believe that Kansas has or would adopt a rule that an
insured's act of changing a beneficiary while subject to a temporary restraining
order restraining the parties to a divorce action from selling, encumbering or
disposing of the parties' property, *automatically* results in the voidance of the
insured's change in the designation of the beneficiary." *Pope v. Cauffman*, 885 F.
Supp. 1451, 1456 (D. Kan. 1995).

In addition to these decisions dealing with life insurance, there
are decisions addressing designations on POD and TOD accounts.
See, *e.g.*, *Estate of Westfall v. Westfall*, 942 P.2d 1227, 1230 (Colo.
App. 1996) (wife's designation of brother as POD beneficiary not
a violation of restraining order).

To analyze which line of authority is most persuasive requires
examination of the role and purpose of the restraining order. In
*Wear* it was stated that the purpose of the restraining order is to
preserve the "status quo between the divorcing parties as to marital
property." 263 Kan. at 179. The restraining order serves the short-
term need of resolving disputes regarding use and control of prop-
erty while the divorce is pending and the long-term goal of main-
taining the court's adjudicatory control over the property. The
purpose of the latter goal is to preserve the marital estate until the
court enters the final property division. To accomplish this goal,
K.S.A. 2002 Supp. 60-1607(a)(1) allows the court to enter an order

which (1) prohibits disposing of property and (2) provides for the use, occupancy, management, and control of the property. However, there is no automatic freezing of assets; rather, the specifics of the order control. The order may prohibit the parties from disposing of assets or allow disposition under certain terms, such as the order in this case which allowed the parties to dispose of assets in the normal course of business. The order may also specify certain terms regarding the use, management, occupancy, or control of property.

Within the context of estate planning, other courts have recognized that the purpose of statutes such as K.S.A. 2002 Supp. 60-1607(a)(1) is not to "freeze each party's estate plan as of the date of the filing" of the divorce action, rather it "is to forbid actions by either party that would dissipate the property of the marital estate or place it beyond the court's adjudicatory power in the dissolution proceeding." *Lonergan v. Strom,* 145 Ariz. 195, 200, 700 P.2d 893 (Ct. App. 1985). See *Benson v. District Court,* 57 Idaho 85, 91-92, 62 P.2d 108 (1936); *Girardi v. Girardi,* 140 App. Div. 2d 486, 487, 528 N.Y.S.2d 397 (1988); *Lindsey v. Lindsey,* 342 Pa. Super. 72, 76, 492 A.2d 396 (1985); *Dyer v. Dyer,* 87 S.W.2d 489, 490 (Tex. Civ. App. 1935); *In re Knickerbocker,* 912 P.2d 969, 976 (Utah 1996).

In this case, the restraining order did not limit the use or control of the property in question, at least in a way which affects the issues in this case. Thus, the question is whether Sheryl's actions disposed of the property. An appropriate test for this determination is that recognized in the above-cited cases: whether the action affected the value of the marital estate or placed the property outside the adjudicatory power of the court. Sheryl's action did not change the value of the marital estate and did not do anything that would prevent the court from having power over the property for purposes of property division.

Ruby, like William in the *Wear* case, had no vested interest in the insurance policy because " '[a] beneficiary has only an inchoate right to the proceeds of a policy, subject to being divested at any time during the lifetime of the insured, by transfer, assignment, or change of beneficiary.' " 263 Kan. at 178 (quoting *Hollaway v.*

*Selvidge,* 219 Kan. 345, 349, 548 P.2d 835 [1976]). Had Ruby and Sheryl not been parties in an action for divorce, Sheryl could have changed the beneficiary designation. The same is true of the POD and TOD accounts. K.S.A. 2002 Supp. 9-1215 provides that the owner of a POD bank account retains the right "to change the designation of beneficiary" and also specifies that the "interest of the beneficiary shall be considered not to vest until the death of the owner." A TOD or POD designation on a security "has no effect on ownership until the owner's death" and a registration of a security in beneficiary form may be canceled or changed at any time without the beneficiary's consent. K.S.A. 17-49a06. Contrary to the Court of Appeals' conclusion, when Ruby filed for divorce, K.S.A. 2002 Supp. 23-201(b) did not change Sheryl's ability to convey or give away property. See *Cady,* 224 Kan. at 344. That is why a restraining order is necessary under K.S.A. 2002 Supp. 60-1607(a)(1) to prevent the disposal of property.

Furthermore, had the divorce been granted before Sheryl's death, Ruby's interest in the property and its value to the estate remained within the adjudicatory power of the court. Pursuant to K.S.A. 2002 Supp. 60-1610(b)(1), the district court would have had the power to divide the property, including granting the cash value or appropriate balances to Ruby, or to order Sheryl to change the beneficiary designations he had previously made. The statute provides:

"The decree shall divide the real and personal property of the parties, including any retirement and pension plans, whether owned by either spouse prior to marriage, acquired by either spouse in the spouse's own right after marriage or acquired by the spouses joint efforts, by: (A) a division of the property in kind; (B) awarding the property or part of the property to one of the spouses and requiring the other to pay a just and proper sum; or (C) ordering a sale of the property. . . and dividing the proceeds of the sale. . . . The decree shall provide for any changes in beneficiary designation on: (A) Any insurance or annuity policy that is owned by the parties, or in the case of group life insurance policies, under which either of the parties is a covered person; (B) any trust instrument . . .; or (C) any transfer on death or payable on death account under which one or both of the parties are owners or beneficiaries." K.S.A. 2002 Supp. 60-1610(b)(1).

The Court of Appeals held Sheryl's actions changed the value of the estate. It did change the value of the estate which Ruby re-

ceived upon Sheryl's death. However, changing or designating a beneficiary did not change the cash value of the insurance policy or the account balances and, therefore, did not change the value of the marital estate for divorce purposes. The appropriate inquiry is only the impact upon the marital estate, and Sheryl's beneficiary designations had no impact until his death. At that point, the divorce action abated and there remained no action for division of the marital estate. *Wear*, 263 Kan. at 184. Ruby no longer had a vested interest in the property pursuant to K.S.A. 2002 Supp. 23-201.

We hold that Sheryl did not dispose of property by changing or designating a beneficiary on the TOD or POD accounts or changing the beneficiary on the life insurance policy. Under the provision of K.S.A. 2002 Supp. 60-1607(a)(1) allowing a court to issue an order providing for the use, management, and control of property, the district court had the power to prohibit Sheryl or Ruby from making a change of beneficiary designation, but no such order was entered in this case.

*Did the Court of Appeals Err in Ruling That Sheryl Did Not or Could Not Unilaterally Sever the Joint Tenancy Property?*

Arthur contends that Sheryl severed all joint tenancies with Ruby on real and personal property and that the Court of Appeals erred in finding that the restraining order barred Sheryl from unilaterally severing the joint tenancies. He points out that other states have recognized that a spouse may sever a joint tenancy with another spouse during a pending divorce proceeding without violating the intent of a restraining order. See *In re Knickerbocker*, 912 P.2d 969. Arthur's petition alleged that Sheryl had severed the joint tenancy interests he and Ruby held in both real and personal property. Arthur contends that Sheryl severed the joint tenancy interests by (1) executing his July 2000 will; (2) creating a revocable trust and transferring property into that trust; (3) changing the beneficiary on his life insurance policy and making TOD and POD designations in favor of his children; (4) filing a motion to sever the joint tenancies in the divorce proceedings; (5) negotiating and executing a property settlement agreement; and (6) making re-

peated statements to family, friends, lawyers, and health care providers that he wanted his children to inherit his property.

Ruby contends that Sheryl's attempts to sever the joint tenancies were insufficient and the restraining order prevented severance.

We find that Sheryl did not sever the joint tenancies on the property in question and, consequently, did not violate the restraining order. Because we reach this holding, we do not decide the broader issue of whether severance of a joint tenancy violates a restraining order which prohibits the disposal of property.

The Court of Appeals correctly determined that execution of a will cannot unilaterally terminate a joint tenancy. "It is hornbook law that neither joint tenant can, without the consent of the other, dispose of his interest in the joint property by will and thereby defeat the right of survivorship." *In re Estate of Laue*, 225 Kan. 177, 185, 589 P.2d 558 (1979). Arthur relied upon *Berry v. Berry*, 168 Kan. 253, 212 P.2d 283 (1949), which held that a husband and wife had severed a joint tenancy by executing joint and mutual wills contractually providing that at the death of one spouse, the other would inherit a life estate in property held in joint tenancy. The Court of Appeals correctly found *Berry* to be distinguishable because Sheryl's 2000 will was not a mutual and contractual will. *Nicholas*, 31 Kan. App. 2d at 469.

Arthur also argues that Sheryl severed the joint tenancy interests, or showed his intent to do so, by designating his children as beneficiaries of his life insurance policy and several accounts. While the beneficiary designations might constitute evidence of Sheryl's intent as to those particular accounts, Sheryl maintained he held those accounts individually and not in joint tenancy. Making a beneficiary designation on one account does not constitute evidence of intent to sever a joint tenancy interest in a different account.

Next, Arthur contends Sheryl severed the joint tenancy interests by negotiating and executing a settlement agreement with Ruby. The Court of Appeals rejected this argument, finding that the settlement agreement was not binding because it was not signed by Ruby or approved by the district court. *Nicholas*, 31 Kan. App. 2d at 467. Arthur has not challenged this portion of the Court of Appeals' ruling in his petition for review.

Arthur also contends that Sheryl severed the joint tenancies by filing a motion to that effect in the divorce proceedings. The district court never ruled on Sheryl's motion because Sheryl's counsel reserved argument on the motion. In *Hall v. Hamilton*, 233 Kan. 880, 884, 667 P.2d 350 (1983), this court quoted the following statement from 20 Am. Jur. 2d, Cotenancy and Joint Ownership § 20 (now § 29): " '[T]he mere commencing of an action for partition of joint-tenancy property does not serve to terminate the tenancy; only the judgment or decree has that effect.' " Filing a motion to sever joint tenancies is analogous to bringing a partition action. We conclude the same rule should apply and hold that the bringing of the action did not sever the joint tenancy where no judgment was entered.

Additionally, Arthur points to Sheryl's repeated statements to family, friends, and lawyers as evidence of his intent to sever the joint tenancies. Citing *Campbell v. Black*, 17 Kan. App. 2d 799, 844 P.2d 759 (1993), Arthur asserts that a simple expression of intent alone is sufficient to sever a joint tenancy. This is not the holding in *Campbell*. In *Campbell*, the Court of Appeals held: "[A] joint tenancy may be terminated (1) by mutual agreement of the parties, (2) by course of conduct indicating tenancy in common, or (3) by operation of law upon destruction of one or more of the required unities (time, title, interest, and possession)." 17 Kan. App. 2d at 804. The *Campbell* court considered the decedent's intent in determining whether the decedent's actions were sufficient to sever the joint tenancy, concluding that the decedent had effectively terminated the joint nature of several accounts by directing the institutions holding those accounts to convert all funds to her sole ownership. The court also considered the decedent's contemporaneous will as evidence of her intent. 17 Kan. App. 2d at 803-04. This approach is consistent with the modern trend of looking to the parties' intent as the operative test of whether a joint tenancy has been severed rather than depending upon the traditional doctrine of the four unities. See Helmholz, *Realism and Formalism in the Severance of Joint Tenancies*, 77 Neb. L. Rev. 1 (1998). However, contrary to Arthur's argument, intent alone will not sever the joint tenancy. Sheryl's intent is irrelevant if he took no effective action.

The only remaining issue is whether Sheryl's transfer of property into a revocable trust severed the joint tenancies. In the trust agreement, Sheryl conveyed the following property listed in Schedule A to himself as trustee:

"1. All of the Grantor's tangible personal property in and about Grantor's place of residence, now owned and hereafter acquired by Grantor, and all other tangible personal property, of whatsoever kind or wheresoever located, now owned and hereafter acquired by Grantor, including but not limited to miscellaneous household goods, furnishings and equipment, and jewelry, and all other tangible personal property owned by the Grantor that does not have a certificate of title.

"2. Lots 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, Block 3 Palmer's Second Addition to the City of LaHarpe, Allen County, Kansas, together with any and all other real estate that the Grantor may own in the State of Kansas."

The trust agreement also included a "Declaration of Trust Ownership" stating that Sheryl held the following property in trust:

"Any and all properties of all kinds, whether tangible or intangible, whether presently owned or hereafter acquired (regardless of the means by which acquired), and wherever situated, including, without limitation:

Bank accounts (checking, savings, certificates of deposit, etc.),

Tenancies in safe deposit boxes,

Mutual and money market funds of all kinds,

Securities (stocks, bonds, treasury bills, notes receivable, etc.),

Agency and custody accounts (at banks, brokerage firms, etc.), and

Real property wheresoever located (mortgages, land contracts, leaseholds, mineral interests, etc.), oil and gas interests (including royalty interests) which now and at any time after the date of this instrument are either registered or titled in the name of Grantor in Grantor's individual capacity (regardless of whatever variation of Grantor's name may be employed), whether as a sole owner or in co-ownership with any other person or persons or entities, *except and for so long as Grantor holds any such property in joint tenancy with rights of survivorship between or among Grantor and any other joint tenant(s)*." (Emphasis added.)

The declaration further provided: "This declaration does not affect or revoke any payable-on-death or transfer-on-death designation with respect to any property that is now in effect; any property subject to such a designation shall be paid or distributed upon Grantor's death to the beneficiaries so designated."

By the trust's own terms, it did not include any property held in joint tenancy. Therefore, unless Sheryl effectively severed the joint tenancies before creating the trust, creation of the trust itself did not have that effect. As discussed earlier, none of Sheryl's other actions had the effect of severing the joint tenancies.

Since Sheryl's actions were not effective in severing the joint tenancies, we need not reach the issue of whether severance of joint tenancy is a violation of a restraining order issued pursuant to K.S.A. 2002 Supp. 60-1607.

Further, because we reverse the Court of Appeals' and the trial court's determinations that there was a violation of the restraining order, we need not address Arthur's request that we adopt the dissent of Chief Judge Rulon and hold that the trial court's ruling violated due process because it sought to alter title to assets held by nonparties, Arthur and Susan.

*Did the Court of Appeals Err in Ruling That Sheryl's Invasion of Privacy Action Abated at His Death?*

Finally, Arthur argues that the Court of Appeals erred in ruling that Sheryl's invasion of privacy action abated at his death. He points out that K.S.A. 60-1802 does not list invasion of privacy as one of those actions which abates upon the death of a party.

Both the district court and the Court of Appeals relied upon *Burroughs v. Thomas*, 23 Kan. App. 2d 769, 937 P.2d 12, *rev. denied* 262 Kan. 959 (1997), in holding that Sheryl's invasion of privacy action did not survive his death. In *Burroughs*, a surviving spouse sought disclosure of the coroner's investigative records regarding the deceased spouse. The district court found the investigative records were public records subject to disclosure under the Kansas Open Records Act, K.S.A. 45-215 *et seq.* On appeal, the coroner argued that the records were exempt under K.S.A. 45-221(a)(30), which provides that an agency is not required to disclose "[p]ublic records containing information of a personal nature where the public disclosure thereof would constitute a clearly unwarranted invasion of personal privacy." The *Burroughs* court rejected the coroner's argument, stating: "The Kansas survival of actions statute, K.S.A. 60-1801, does not provide for survival of a

cause of action for invasion of privacy, which generally may only be claimed by the person whose privacy was invaded." 23 Kan. App. 2d at 772.

Arthur accurately points out that this language is dicta. The question in *Burroughs* was whether certain records were subject to public disclosure as open records; no action for invasion of privacy was involved. Furthermore, the *Burroughs* court cited no authority for its conclusion that a cause of action for invasion of privacy does not survive a party's death.

Whether a cause of action survives a party's death is governed by K.S.A. 60-1801 and K.S.A. 60-1802, which provide as follows:

"In addition to the causes of action which survive at common law, causes of action for mesne profits, or *for an injury to the person*, or to real or personal estate, or for any deceit or fraud, or for death by wrongful act or omission, shall also survive; and the action may be brought notwithstanding the death of the person entitled or liable to the same." (Emphasis added.)

"No action pending in any court shall abate by the death of either or both the parties thereto, except an action for libel, slander, malicious prosecution or for a nuisance."

In *Gross v. VanLerberg*, 231 Kan. 401, 405, 646 P.2d 471 (1982), this court held that "whether a particular cause of action survives the death of a party is to be determined by K.S.A. 60-1801. K.S.A. 60-1802 simply provides the procedure for the continuation of an action by substitution of parties in cases where the cause of action survives the death of a party." Thus, the question to be resolved is whether the language of K.S.A. 60-1801, which provides for the survival of causes of action for injury to the person, is sufficiently broad to encompass a cause of action for invasion of privacy.

Arthur points out that other jurisdictions have found the language "injuries to the person" in survival statutes to be broad enough to encompass invasion of privacy. K.S.A. 60-1801 contains the same language. In support, he cites *Reed v. Real Detective Pub. Co.*, 63 Ariz. 294, 300-01, 162 P.2d 133 (1945), and *Allred v. Solaray*, 971 F. Supp. 1394, 1398 (D. Utah 1997). Neither case provides direct support for Arthur's argument.

In *Reed*, the Arizona Supreme Court interpreted an Arizona survival statute which provided that an action "for injuries to the per-

son . . . shall not abate by reason of the death of the defendant." The court explained that "injuries to the person" did not encompass all "personal injuries" and distinguished between injuries to the person and injuries to the person's reputation. 63 Ariz. at 300-01. The court found that a claim for libel was a claim for injury to the reputation and did not survive but that a claim for invasion of privacy, which was alleged to have caused mental suffering to the plaintiff, was an injury to the person and did survive. Thus, the court held that the plaintiff's cause of action for violation of the right to privacy was a personal action which could be revived against the estate of the deceased defendant. 63 Ariz. at 301-06.

Notably, it was the defendant in *Reed* who had died, not the plaintiff, and the statute at issue provided for causes of action which survived a defendant's death, not a plaintiff's. It is not clear that the *Reed* court would have reached the same conclusion if the plaintiff had died, for the court recognized that an invasion of privacy action "is a personal action which does not survive the death of the injured party." 63 Ariz. at 304.

In *Allred v. Solaray, Inc.*, the United States District Court interpreted Utah law in determining that an employee's claims under the Americans with Disabilities Act did not survive his death. The Utah survival statute provided that "[c]auses of action arising out of personal injury to the person . . . do not abate upon the death of the . . . injured person." Utah Code Ann. § 78-11-12(1)(a) (1996). The court cited *Reed* for the premise that injuries to the person do not necessarily mean only physical injuries; mental suffering may also be included. However, the court also concluded that the term "personal injury to the person" did not include claims for injury to a person's rights, reputation, or property. Because an ADA claim is not a claim of injury to the person, but rather a claim of injury to the person's rights or reputation, the court held ADA claims do not survive a plaintiff's death under Utah law. 971 F. Supp. at 1398.

Ruby, on the other hand, cites *Carter v. City of Emporia, Kan.*, 543 F. Supp. 354 (D. Kan. 1982), in support of her argument that Sheryl's invasion of privacy action abated at his death. In *Carter*, the United States District Court interpreted K.S.A. 60-1801 and

60-1802, stating: "K.S.A. 60-1802 provides that claims for libel, slander and malicious prosecution, which are personal in nature, abate at the death of the party making such claims." 543 F. Supp. at 356. The court found that the plaintiff's claim under 42 U.S.C. § 1981 (1982) "for denial of rights on the basis of race" was similarly personal in nature and therefore abated. 543 F. Supp. at 356.

The analysis of *Carter* is consistent with the general rule that an action for invasion of privacy is personal in nature and must be brought by a living person who was the subject of that invasion of privacy. In this case, the Court of Appeals noted that even a close relative may not recover for the invasion of privacy of another, citing 62A Am. Jur. 2d, Privacy § 20, p. 650. 31 Kan. App. 2d at 474. That publication also states: "The general rule that an action for invasion of privacy may be brought only by the person who was the actual subject of the invasion of privacy, and not by other persons such as members of his or her family, applies in cases where the subject is deceased." 62A Am. Jur. 2d, Privacy § 21, p. 651.

In *Dotson v. McLaughlin,* 216 Kan. 201, 208, 531 P.2d 1 (1975), this court adopted the Restatement (Second) of Torts analysis of the right to privacy and directed "that the courts of this state should follow it in fixing the boundaries for its protection." Restatement (Second) of Torts § 652I (1976) provides: "Except for the appropriation of one's name or likeness, an action for invasion of privacy can be maintained only by a living individual whose privacy is invaded." The comments explain:

"*a.* The right protected by the action for invasion of privacy is a personal right, peculiar to the individual whose privacy is invaded. The cause of action is not assignable, and it cannot be maintained by other persons such as members of the individual's family, unless their own privacy is invaded along with his. The only exception to this rule involves the appropriation to the defendant's own use of another's name or likeness. (See § 652C, particularly Comment *a*).

"*b.* In the absence of statute, the action for the invasion of privacy cannot be maintained after the death of the individual whose privacy is invaded. In a few states particular statutes permit the survival of an action for invasion of privacy that has occurred before death. In a smaller number of states there is statutory authorization for an action on the part of surviving relatives for invasion of the privacy of one who is already deceased, with the invasion occurring after his death. Since appropriation of name or likeness is similar to impairment of a property

right and involves an aspect of unjust enrichment of the defendants or his estate, survival rights may be held to exist following the death of either party."

Kansas statutes contain no specific language referencing actions for invasion of privacy. If the action survives, it does so under the language of the general statute allowing for injuries to the person. Some courts have rejected arguments that general references to survival of actions are sufficient to keep the invasion of privacy claim from abating. In *Mineer v. Williams*, 82 F. Supp. 2d 702 (E.D. Ky. 2000), the court rejected an argument similar to Arthur's:

"Plaintiff argues that the need for a statute to preserve her privacy right of action is met by Ky. Rev. Stat. § 411.140, *supra,* which preserves all rights of action after the death of the claimant 'except actions for slander, libel, criminal conversation, and so much of the action for malicious prosecution as is intended to recover for personal injury.'

"Plaintiff invokes the ancient maxim *expressio unius est exclusio alterius* (the mention of one thing implies the exclusion of other things not mentioned). She argues that the specific mention of actions for libel and slander as abating with the death of the injured person, with no mention of privacy, implies that an action for privacy should survive.

"The court holds, however, that there was no need to mention the right of privacy action specifically because one of its essential elements is that only a living person can sue for invasion of privacy. Restatement of Torts (Second) § 652, *supra.*" 82 F. Supp. 2d at 705.

Other courts have noted that this element requiring a living person to bring the action is important in privacy actions "[b]ecause the alleged injuries are so personal, a jury would have to guess on the extent and nature of the decedent's emotional devastation, humiliation and ostracism without his presence and testimony at trial." *Estate of Benson v. Minn. Bd. of Med.*, 526 N.W.2d 634, 637 (Minn. App. 1995).

Consistent with our approach to defining the parameters of a right to privacy action by following the Restatement (Second) of Torts, we hold an invasion of privacy action as stated in this case for intrusion upon seclusion does not survive the death of the alleged victim.

### *Motion for Substitution of Surety on Supersedeas Bond*

On October 7, 2003, Ruby filed a motion asking this court to require substitution of the surety on Arthur's supersedeas bond.

Arthur's attorney currently serves as surety. Ruby argues this violates Supreme Court Rule 114 (2003 Kan. Ct. R. Annot. 168), which provides that no attorney may act as surety on a bond in a case in which the attorney is counsel. Arthur filed a response arguing that Supreme Court Rule 114 only applies to bonds taken by a clerk or sheriff. Because the district court approved the bond in this case, Arthur contends Rule 114 does not apply.

Rule 114 provides in its entirety:

"Whenever any bond is permitted or required to be taken by a clerk or sheriff in accordance with the provisions of Chapter 60 without being approved by the court, it shall be sufficient if the surety thereon is a surety company currently admitted to do business in the State of Kansas. No corporation other than a surety company may be accepted as a surety unless so ordered and approved by the judge. Whenever a natural person is accepted and approved as a surety by a clerk or sheriff, the surety shall be required to attach to the bond a sworn financial statement which reasonably identifies the assets relied upon to qualify him as surety and the total amount of any liabilities, contingent or otherwise, which may affect his qualifications as a surety. *No attorney or the attorney's spouse may act as a surety on a bond in any case in which the attorney is counsel.* The principal on any bond may at his option, in lieu of providing a surety, deposit with the clerk of the district court cash money in the full amount of the bond. The deposit shall be retained by the clerk until the bond is fully discharged and released or the court orders the disposition of the deposit." (Emphasis added.) (2003 Kan. Ct. R. Annot. 168-69.)

Although the first sentence of Rule 114 applies only to bonds "permitted or required to be taken by a clerk or sheriff in accordance with the provisions of Chapter 60 without being approved by the court," the remainder of the rule is not limited to those particular types of bonds. The sentence relied upon by Ruby, which prohibits an attorney from acting as surety in a case in which the attorney is counsel, stands alone. Ruby's motion for substitution of the surety, therefore, has merit and is granted. If there are further proceedings on appeal or otherwise requiring a surety, Arthur must obtain a different surety on his supersedeas bond.

Affirmed in part, reversed in part, and remanded.

DAVIS and BEIER, JJ., not participating.

BRAZIL, S.J., and BENNINGTON, J., assigned.