(178 P.3d 667)
Nos. 96,229
96,981

ESTATE OF ARCHIE KIRKPATRICK, *Appellee*, v. THE CITY OF OLATHE, KANSAS, *Appellant*, and COOK, FLATT & STROBEL, ENGINEERS, P.A., *Defendant*.

Opinion filed March 7, 2008.

*Leonard A. Hall,* assistant city attorney, and *Diane S. Mills,* of Law Offices of Donald B. Balfour, of Kansas City, Missouri, for appellant.

*Nancy J. Crawford,* of Smithyman & Zakoura, Chartered, of Overland Park, for appellee.

Before GREEN, P.J., GREENE and LEBEN, JJ.

GREENE, J.: The City of Olathe (the City) appeals the district court's judgment on a claim of inverse condemnation in favor of the Estate of Archie Kirkpatrick, arguing that its actions did not constitute a compensable taking of the Estate's property. We agree and reverse the district court.

### Factual and Procedural Background

Archie Kirkpatrick owned and resided in property that sits on the northwest corner of the intersection at Ridgeview Road and Sheridan Avenue when the City approved a plan to improve that intersection with the construction of a roundabout. As part of the intersection improvement, the City took by eminent domain 355 square feet of Kirkpatrick's property for a permanent road right-of-way and 426 square feet for a temporary construction easement. Kirkpatrick did not appeal the compensation awarded in the eminent domain proceeding.

The City began construction of the roundabout in early 2000 and completed it in July 2001. According to the district court, the City became aware of "potential drainage problems" soon after it began construction and concluded the water problems would subside after construction was complete. In late June 2001, a friend of Kirkpatrick's, excavated near the house to determine the cause of the basement water problems at Kirkpatrick's residence. During excavation, DuVall noticed that the hole he dug was dry from the surface down 4 feet, but from there, wet to the bottom of the approximately 9-foot hole. DuVall installed a second sump pump but apparently did not fix the basement water problems, and water continued to enter the house after it rained. Kirkpatrick hired the

May Development Company (May) to do additional foundation repair to his house in the summer of 2003. Over the course of the summer, May installed another sump pump in the house, jacked up the house, and installed piers and steel supports along the back foundation. During early August 2003, the basement floor cracked.

In September 2003, Kirkpatrick filed a claim under the Kansas Tort Claims Act (KTCA), K.S.A. 75-6101 *et seq.*, against the City. Kirkpatrick alleged the City had damaged or taken his property "due to [the] change of grade or disruption of natural underground barriers as a result of the construction of public improvements located at the intersection of Ridgeview Road and Sheridan Avenue . . . ." Because the City did not respond to Kirkpatrick's claim within 120 days, Kirkpatrick filed his petition against the City on January 21, 2004, and later amended to include the project engineer, the construction contractor, and the project inspector as defendants after these parties were brought in through third-party actions. After Kirkpatrick's death in September 2005, Kirkpatrick's estate (Kirkpatrick or Estate) was substituted as plaintiff.

The City filed two summary judgment motions in which it argued that it was immune from liability for the tort claims under the KTCA and that the property Kirkpatrick alleged was taken without compensation was acquired in the City's condemnation proceeding. It does not appear that it ruled on the first summary judgment motion, but the district court denied the second motion. The district court rejected the City's second motion for summary judgment after concluding that whether the City's diversion of groundwater into Kirkpatrick's property was a natural consequence of the improvement or resulted from a negligent deviation from the approved design was a substantial material fact that precluded summary judgment.

The court later held a bench trial on Kirkpatrick's action. In its journal entry of judgment, the district court concluded that the City conformed to the necessary standard of care in designing the roundabout. Further, the court concluded that no party had negligently deviated from the approved plan, and thus no party negligently caused damage to Kirkpatrick's property. The court then analyzed the inverse condemnation claim and concluded that the

City partially took Kirkpatrick's property by damaging it without paying just compensation for its taking. The detail of the court's findings and conclusions will be discussed below.

Based on the court's findings, Kirkpatrick orally moved for attorney fees and offered to give the court a copy of *Bonanza, Inc. v. Carlson*, 269 Kan. 705, 9 P.3d 541 (2000). After considering the parties' motions and arguments, the court awarded Kirkpatrick fees under K.S.A. 58-3502 over the City's objections. The City's post-trial motion was denied, and it appeals.

### *Did the District Court Err in Determining that the Estate's Property Had Suffered a Compensable Taking to Support an Inverse Condemnation Award?*

The City initially argues that the district court erred in concluding that there was any compensable taking of the Estate's property to support the inverse condemnation award. This question is one of law requiring de novo review. *Korytkowski v. City of Ottawa*, 283 Kan. 122, 128, 152 P.3d 53 (2007).

#### *Kansas Inverse Condemnation Law*

The Fifth Amendment to the United States Constitution prohibits government from taking private property for public use without paying the owner just compensation. The Fifth Amendment prohibition applies to the states through the Due Process Clause of the Fourteenth Amendment. *Lone Star Industries, Inc. v. Secretary, Kansas Dept. of Transp.*, 234 Kan. 121, 123, 671 P.2d 511 (1983). Kansas has codified this prohibition in K.S.A. 26-513(a): "Private property shall not be taken or damaged for public use without just compensation."

An inverse condemnation action is initiated by an owner of private property to recover compensation from a governmental entity that has taken the owner's property without instituting a formal eminent domain proceeding. To establish a claim for inverse condemnation, a party must establish an interest in the real property and a taking. *Kau Kau Take Home No. 1 v. City of Wichita*, 281 Kan. 1185, 1189-90, 135 P.3d 1221 (2006).

Our review of Kansas case law leads us to the conclusion that our Supreme Court has adhered to the view that an inverse con-

demnation does not lie unless the government has acquired possession as well as the right of possession and control to the exclusion of the former owner. In this regard, we note that Kansas law must be distinguished with other jurisdictions in continuing its rather restrictive definition of a taking. Contrast, *e.g.*, 26 Am. Jur. 2d, Eminent Domain §245, where the following statement of law is recognized:

"[I]t has been held that a body possessing the right to exercise the power of eminent domain is required to make compensation for damages for land not taken resulting from the obstruction or diversion of, or other interference with, the flow of surface water as the result of raising the grade of a highway or a railroad, on the ground that such obstruction, diversion, or interference is a taking or damaging of such land within the meaning of the constitutional provision requiring compensation to be made on the taking or damaging of private property for public use."

In any event, whether the Estate established a compensable taking is the central issue in this appeal.

### *Was There a Compensable Taking Here?*

Here, the City does not challenge on appeal the district court's findings of fact. We examine those facts before applying the legal principles. The court found in material part:

"4. The City was first aware of potential drainage problems shortly after the project started.

. . . .

"12. [Kirkpatrick's friend] Duvall began digging a big hole, noted that it was wet in the hole, although the amount of water differed between the witnesses. Several witnesses observed water in the hole that was excavated in July 2001. Some saw as much as two feet of water. Mr. Duvall noted ground water seeping in about four feet below the surface. Above the area of seepage was dry, and below was muddy. There was three-fourths of an inch of water visible on the [Kirkpatrick's] basement floor.

. . . .

"17. Mr. Duvall and Mr. Jim Linker both saw water coming from along the water service line, trickling from the water line at the edge of the property. The water followed the path of least resistance. The water was not chlorinated or sewage. It was ground water.

"18. Mr. Duvall testified that he removed six to eight 55 gallon drums of water within three days, during the time that he excavated.

. . . .

"29. Linker tested the water and three times it turned out to be ground water.

. . . .

"35. Evidence shows that prior to the roundabout construction, the house sat higher than the intersection.

"36. The construction disturbed soil. This can create freer flow of water. There has been testimony that compacted soil is less pervious to water flow.

"37. The center of the roundabout is higher than it was before the construction project.

"38. The court believes compacted soil is more impervious to seepage than disturbed soil. This allowed water to follow the path of least resistance. Water followed the path of least resistence from the service line to the house. The water service line should not have been laid on gravel; the gravel may have worsened the flowing ground water problem.

. . . .

"48. There were no problems before the roundabout was constructed, and there were problems after the roundabout was constructed.

. . . .

"57. There was inverse condemnation. The City knew there was a problem. There was a taking. Had the City jumped in when it first knew of a problem, damage could have been avoided. The net result was that the plaintiff suffered a taking at that time, in the amount of $17,000.00."

The City argues these facts do not establish a compensable taking because the City did not acquire possession of Kirkpatrick's property in any manner, citing *Kau Kau*, 281 Kan. 1185. It argues that the excavation and construction of the roundabout may have changed the grade of land, but no property rights of Kirkpatrick were taken. It suggests that the facts may establish a claim for relief in tort, but not a claim for inverse condemnation, citing *Deisher v. Kansas Dept. of Transportation*, 264 Kan. 762, 774, 958 P.2d 656 (1998). The Estate does not effectively counter these arguments, except to cite the statutory language in K.S.A. 26-513(a) that describes a taking as including "property . . . damaged for public use."

Frankly, our attempt to synthesize Kansas law on inverse condemnation has not been easy. Commentators have likewise noted that inverse condemnation law in Kansas is "extremely unsettled." See, *e.g.*, Note, *Flooding of Private Property by the Construction of a Public Improvement: Isn't It Time for Kansas to Call It What It Really Is—A Compensable Taking?*, 38 Washburn L.J. 209 (1998). The fundamental tension seems to stem from the statutory

language recognizing that a taking includes "property damaged," but case law seems to require that property rights be taken to the exclusion of the owner—not just damaged.

In *Sester v. Belvue Drainage District*, 162 Kan. 1, 173 P.2d 619 (1946), our Supreme Court held that a claim of condemnation does not extend to cases where land is not actually taken but is only indirectly or consequentially damaged, stating:

"There is a great difference between intentional taking of land in the exercise of governmental power and injury resulting to land as a consequence therefrom. A consequential injury is not a taking of private property for public use with the meaning of the Fifth Amendment." 162 Kan. at 6.

See *Steck v. City of Wichita*, 179 Kan. 305, 295 P.2d 1068 (1956); *Foster v. City of Augusta*, 165 Kan. 684, 199 P.2d 799 (1948).

The need for a taking as a predicate to an inverse condemnation claim, as contrasted with a tort claim for damages resulting from public actions, may have been somewhat muddled by the court in *Sanders v. State Highway Commission*, 211 Kan. 776, 780, 508 P.2d 981 (1973), where the court stated:

"When land or rights therein are appropriated by a public corporation having rights of eminent domain without first procuring title the owner may waive formal condemnation proceedings and other formal modes of acquisition and sue to recover compensation. *The owner may recover all damages which he has sustained by reason of the permanent taking* and appropriation of his property. [Citation omitted.]" (Emphasis added.)

The court thereafter adhered to the general rule that a taking requires acquisition of possession and control to the exclusion of the former owner, but "relaxed" the rule somewhat to recognize a taking in cases concerning lateral support and access. See *Ventures in Property I v. City of Wichita*, 225 Kan. 698, 707, 594 P.2d 671 (1979). Notwithstanding this language, the court later suggested that *Ventures* "does not radically relax the concept of 'taking.' " *Lone Star*, 234 Kan. at 129.

In *Deisher*, 264 Kan. at 772, the court once again defined a "taking" as "acquiring of possession as well as the right of possession and control of tangible property to the exclusion of the former owner," citing *Lone Star*, 234 Kan. at 125. The court carefully

distinguished between a claim of inverse condemnation and one in tort, stating:

"In this case . . . the property damage [a reduction in water well levels] was not necessary to the taking of property for public use. The State neither needed the Deishers' water nor needed to divert their water. The drop in plaintiffs' water level resulted from a tortious act. Consequently, the district court correctly concluded both that the Deishers' remedy lay in tort, not in inverse condemnation . . . ." 264 Kan. at 774.

Most recently, our Supreme Court in *Kau Kau* quoted the *Deisher* definition of a taking and once again distinguished an inverse condemnation claim from a tort claim, stating:

"Appellants do not allege that the contractors asserted control over the property to the exclusion of the Appellants. The alleged damage to the Appellants' property caused by the contractors driving over the property was not necessary to the completion of the City's project. The alleged damage was caused by the contractor's negligence. Consequently, the Appellants' claim sound in tort, not inverse condemnation." 281 Kan. at 1190.

Based upon these authorities, we conclude that a claim of inverse condemnation does not lie unless there is a taking as defined in *Deisher*, and that mere damage to an adjoining property is not a compensable taking *unless* the damage was necessary to the completion of the public use project. Here, as in *Deisher*, we must conclude the City did not need to divert water in order to complete its construction of the roundabout because there was no such contention by the Estate nor was there any such finding by the district court. This may seem a somewhat narrow application of the statutory language that seems to extend a taking more generally to "property damaged," but we are constrained in our application of the statute by controlling Supreme Court authority.

Here, the City excavated adjacent land and changed the grade in constructing the roundabout, but no property or property right was taken. Moreover, the City may have caused more water to invade Kirkpatrick's property than before the construction, but any such invasion or diversion of water was not necessary to the public improvement.

Moreover, Kirkpatrick has not alleged or presented authorities providing for a common-law *property* right that was taken by the

City. The right to quiet enjoyment is not a recognized property right, but is either recognized as a personal right that can be harmed by a nuisance, or as a promise from a seller to a buyer that no other person has a superior title that could force the buyer from the purchased land. *Nicholas v. Nicholas*, 277 Kan. 171, 189, 83 P.3d 214 (2004) (noting that a nuisance claim is personal and does not survive death); *Vickridge Homeowners Ass'n, Inc. v. Catholic Diocese of Wichita*, 212 Kan. 348, 354, 510 P.2d 1296 (1973) (listing tort elements); *Cities Service Oil Co. v. Grunder*, 149 Kan. 82, 86-87, 86 P.2d 495 (1939) (citing authority regarding quiet enjoyment).

Accordingly, the Estate failed to state an inverse condemnation claim as a matter of law, and the district court erred in concluding otherwise and must be reversed. There is no need to analyze the City's potential tort liability, because the district court held against the Estate on its claim of negligence, and no appeal has been taken from this judgment.

The City also appeals the award of attorneys fees to the Estate. Because we have reversed the judgment against the City, the award of fees must also be reversed.

Reversed.