No. 101,335

BEN J. and LAVELLE FRICK, *Appellants*, v. CITY OF SALINA, KANSAS, a Municipal Corporation, *Appellee*.

(235 P.3d 1211)

Opinion filed July 9, 2010.

*Joseph R. Borich III*, of Leawood, argued the cause; and *Douglas J. Patterson*, of Leawood, was with him on the briefs for appellants.

*Jason B. Prier*, of Orrick & Associates, L.L.P., of Overland Park, argued the cause, and *Timothy P. Orrick* and *Anthony J. Orrick*, of the same firm, were with him on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: Our resolution of this appeal emphasizes the requirement that a party opposing summary judgment must come forward with evidence to establish a dispute as to a material fact and must support the dispute by precisely citing to transcripts, depositions, interrogatories, admissions, affidavits, exhibits, or other supporting documents in the record. In this case, Ben and Lavelle Frick (Fricks) failed to meet these requirements when responding to the City of Salina's (City) motion for summary judgment. Consequently, we hold that the district court properly granted the City summary judgment on the Fricks' claims that the City inversely condemned their property by denying them the ability to construct driveways or otherwise access their property, improperly refusing to grant them a building permit, and damaging their property.

## FACTS AND PROCEDURAL BACKGROUND

This is the second time the Fricks have raised an appeal before this court. In the previous case, *Frick v. City of Salina*, 289 Kan. 1, 208 P.3d 739 (2009) (*Frick I*), the Fricks appealed the calculation of relocation benefits awarded under the Kansas Relocation Assistance for Persons Displaced by Acquisition of Real Property Act, K.S.A. 58-3501 *et seq.*, after the City acquired, through the power of eminent domain, see K.S.A. 26-501 *et seq.*, the Fricks' real property at 1056 E. Pacific Avenue, on which the Fricks operated a large retail complex. The City acquired the property as part of a public improvement project, generally referred to as the North Ohio Street Improvement Project (the Project), which involved the reconstruction of North Ohio Street, the construction of a bridge over the Union Pacific railway lines, and the redesign and reconstruction of appurtenant side roads. In *Frick I*, we held that, under K.S.A. 58-3509(a), the district court applied an incorrect standard of review to the hearing examiner's administrative findings. Consequently, we reversed and remanded to the district court for independent findings of fact and conclusions of law regarding the question of relocation benefits based on the record of

proceedings before the hearing examiner. *Frick I*, 289 Kan. at 3, 23-24.

This case is an outgrowth of the same Project and is tied to the Project in two ways. First, the Project included improvements to Pacific Avenue, the street that abuts the subject property located at 830 E. Pacific Avenue. Second, the subject property is located adjacent to the Project and is the location to which the Fricks attempted to relocate some of their businesses that were dislocated by the Project. (For ease of reference we will refer to 830 E. Pacific Avenue as the "relocation site").

According to the Fricks, their attempt to move their businesses to the relocation site was thwarted by the "inappropriate regulatory" actions of the City. They brought six counts alleging inverse condemnation claims based on the City's: (1) denial of reasonable access to the relocation site during the Project; (2) construction activities that caused damages to the relocation site; (3) requirement that driveway entrances built by the Fricks be removed; (4) adoption of a moratorium ordinance restricting the installation of driveways, culverts, or other improvements within the right-of-way encompassed by the Project zone; (5) failure to issue a building permit to the Fricks; and (6) construction activities that altered drainage, caused water to be retained, and resulted in flooding of and damages to the relocation site.

The relocation site is comprised of approximately 10 acres located within the Fricks' 21 acres of real property platted as the "Replat of Marysdale Addition." (Only the relocation site, not the entire 21 acres, is the focus of the Fricks' inverse condemnation claim.) As described by the Fricks, the relocation site consists of Lots 1, 2, and 3 in the northeastern corner of the replat of Marysdale Addition, bordered on the north by Pacific Avenue. Although the relocation site is zoned "I-3 Industrial," the past and current use of the property has been for agricultural purposes. The Fricks intended to obtain a building permit for Lot 3, the parcel on the east end of the relocation site.

Before the City's Project, the Fricks' property in the replat of Marysdale Addition was served by one access point—a field entrance, *i.e.*, dirt driveway—from Pacific Avenue at Lot 1, which is

located at the west end of the relocation site. As part of the Project, the Kansas Department of Transportation installed a concrete driveway apron from the realigned Pacific Avenue to the Fricks' property in roughly the same location as the previous field entrance to Lot 1.

At the time construction was beginning for the Project in late April or early May 2005, the Fricks constructed two dirt-fill driveway approaches (with reinforced concrete pipe drainage culverts) to Lot 3 from Pacific Avenue without first requesting or receiving a permit. These dirt driveways were installed in the construction zone and within the City's right-of-way.

On May 2, 2005, the City enacted Ordinance 05-6962 as part of the Salina City Code. The Ordinance imposed a moratorium prohibiting the construction or installation (or the granting of any permits for the construction or installation) of any driveway crossings, culverts, or other improvements within the public right-of-way located within the Project and on Pacific Avenue, west to Front Street. The Fricks' relocation site was located within the area covered by the moratorium. The City cited the following reasons for imposing the moratorium:

"1. The granting of permits for such driveway crossing cannot be properly administered until traffic safety studies have been completed in order to identify safe locations for such driveway crossings.

"2. Construction activity in the public right-of-way within the confines of the project may result in anticipated cost to the public due to either delays or the need to remove such improvements in conflict with the public project construction.

"3. Construction activity in the public right-of-way within the confines of the project could result in avoidable economic loss to private parties in the event such improvements must be removed in order to complete the public project."

The moratorium remained in effect until February 25, 2008, when the Project was completed. It was lifted by Resolution 08-6596 upon the advice of the city engineer that the construction of the Project and the reconfiguration of the affected public streets within the confines of the Project had been completed and in use for a sufficient period of time that the traffic volumes and traffic patterns appeared to be established.

The Fricks first learned of the moratorium when the City's Director of Public Works, Shawn O'Leary, sent them a letter on May 3, 2005, and advised them of the moratorium. O'Leary also advised the Fricks that their construction of "two driveway approaches on the south side of East Pacific Avenue" violated the City Code. He gave the Fricks notice to remove "all culverts, concrete, forms and earthen material from this location by Monday, May 9, 2005." The Fricks removed the driveways and culverts (also referred to as "Lot 3 driveways") after receiving the letter.

On May 4, 2005, the Fricks sent a letter to O'Leary regarding the traffic safety studies mentioned in the moratorium. O'Leary's responsive letter indicated that the studies are performed by traffic engineers or other qualified professionals on behalf of the property owner or developer. He encouraged the Fricks to submit their proposed development project to the City's Development Coordinator Amy Lange.

For the next 10 months, there were communications between the Fricks and the City regarding a proposed building on Lot 3. On March 6, 2006, the Fricks submitted building application documents to the City and submitted additional revised plans in response to the City's requests for additional information. Although their intent was originally to relocate a restaurant/bar to that site, the Fricks never submitted a complete application for this type of building. They revised their request to obtain a "shell building" (cold storage) permit. The Fricks claimed to have submitted enough information necessary for obtaining a shell building permit or a "staged building" (foundation, walls, roof, and sewer lines) permit. As will be discussed in more detail, correspondence from Lange to the Fricks indicated otherwise and specifically listed numerous items that had yet to be submitted with their permit application.

During this same time period, construction continued on the Project. The City had not acquired any easements or rights-of-way on the Fricks' relocation site because the improvements associated with the Project would not require any physical intrusion on the site. Nevertheless, the Fricks contended that contractors for the Project entered their property and caused damage. The Fricks also

contended that the City diverted water onto their property and into the drainage ditches along Pacific Avenue, causing flooding problems.

When these issues could not be resolved, the Fricks brought suit. After discovery and identification of expert witnesses, the City filed its motion for summary judgment. The district court granted the City's motion, finding that the material facts were undisputed and that the "controverted facts set out by [the Fricks] are disagreements between the parties about the removed [driveway] culverts and the building permit rather than controverted material facts." The district court also found there was no "taking" in that the City's actions did not result in the City's obtaining possession and control of the Fricks' property to the exclusion of the Fricks. In addition, the district court, relying on Kansas precedent which was subsequently reversed in 2009, held that the Fricks failed to state a cause of action for inverse condemnation with regard to their property damage and flooding claims because they did not present any controverted facts establishing that the property damage and water problems were "necessary" to the completion of the Project. The district court's other findings and conclusions will be discussed as needed.

The Fricks now appeal the district court's decision to grant the City's motion for summary judgment. The case was transferred to this court on the Fricks' motion. See K.S.A. 20-3017. For ease of discussion, we have taken the liberty of reordering and regrouping the seven issues identified by the Fricks in their appellate briefs.

STANDARD OF REVIEW/PRINCIPLES OF LAW

Inverse condemnation proceedings are initiated by the party having a property interest and are available when private property has been taken for public use without the initiation of formal condemnation proceedings by the government. *Estate of Kirkpatrick v. City of Olathe*, 289 Kan. 554, 559, 215 P.3d 561 (2009). To establish a claim for inverse condemnation, a party must establish an interest in the real property and a taking. *Korytkowski v. City of Ottawa*, 283 Kan. 122, 128, 152 P.3d 53 (2007). The factual component of the issue relates to the nature of an interest in the

real property and the nature of the public use or regulation of that property. Here, the City submits that the facts related to those inquiries were not controverted, leaving only the question of whether those circumstances constituted a compensable taking. That question, *i.e.*, the question of whether there has been a compensable taking, is one of law. *Korytkowski*, 283 Kan. at 128.

The Fricks disagree and argue there were controverted issues of material fact and, as a result, summary judgment should not have been granted. When such an argument is raised in an appeal from an order of summary judgment, an appellate court applies the same summary judgment rules as does a district court. *Adams v. Board of Sedgwick County Comm'rs*, 289 Kan. 577, 584, 214 P.3d 1173 (2009). The standard a district court applies when considering a motion for summary judgment is a familiar one:

" 'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case.' " *Adams*, 289 Kan. at 584 (quoting *Miller v. Westport Ins. Corp.*, 288 Kan. 27, Syl. ¶ 1, 200 P.3d 419 [2009]).

When there is no factual dispute, appellate review of an order for summary judgment is de novo. *Estate of Draper v. Bank of America*, 288 Kan. 510, 517, 205 P.3d 698 (2009); *Cooke v. Gillespie*, 285 Kan. 748, 754, 176 P.3d 144 (2008).

As we apply the summary judgment standard, we must also consider the procedural requirements of Supreme Court Rule 141 (2009 Kan. Ct. R. Annot. 225), Rule 6.02 (2009 Kan. Ct. R. Annot. 38), and Rule 6.03 (2009 Kan. Ct. R. Annot. 42).

Rule 141 facilitates the examination of whether there are genuine issues of material fact. It requires the moving party to set "forth concisely in separately numbered paragraphs the uncontroverted contentions of fact relied upon by said movant (with precise references to pages, lines and/or paragraphs of transcripts,

depositions, interrogatories, admissions, affidavits, exhibits, or other supporting documents contained in the court file and otherwise included in the record)." Rule 141(a) (2009 Kan. Ct. R. Annot. 225-26). A similar requirement is imposed on any party opposing the motion for summary judgment. That party must set "forth in separately numbered paragraphs (corresponding to the numbered paragraphs of movant's memorandum or brief) a statement whether each factual contention of movant is controverted, and if controverted, a concise summary of conflicting testimony or evidence, and any additional genuine issues of material fact which preclude summary judgment." The party opposing the summary judgment also must make "precise references" to the transcripts, depositions, interrogatories, admissions, affidavits, exhibits, or other supporting documents in the record. Rule 141(b) (2009 Kan. Ct. R. Annot. 226).

Over the years, this court has repeatedly emphasized that " 'Rule 141 is not just fluff—it means what it says and serves a necessary purpose.' [Citation omitted.]" *Rhoten v. Dickson*, 290 Kan. 92, 104, 223 P.3d 786 (2010). Nevertheless, we have concluded an initial failure to comply with Rule 141 may be considered harmless and will "not be considered fatal if the party complies with the rule in subsequent filings before the district court renders judgment." *Rhoten*, 290 Kan. at 105. The corollary to this conclusion is that a failure to comply with Rule 141 may be fatal if nothing is cited to support a party's evidentiary allegations before the district court renders judgment. As we will discuss, this requirement becomes important as we examine some of the Fricks' efforts to controvert facts.

Similar implications arise from Rule 6.02, relating to an appellant's brief, and its counterpart provision in Rule 6.03, relating to an appellee's brief. Those rules require that statements of the facts "be keyed to the record on appeal by volume and page number so as to make verification reasonably convenient. Any material statement made without such a reference may be presumed to be without support in the record." Rule 6.02(d) (2009 Kan. Ct. R. Annot. 38); see Rule 6.03(c) (2009 Kan. Ct. R. Annot. 42-43). We have found that the Fricks' citations to the record are frequently missing

from or inaccurate in their briefs, making it difficult to find documents or support for their position in the record. Again, as more fully discussed, these failures impact the outcome of this appeal.

ISSUE 1: *Did the district court err in granting the City's motion for summary judgment with respect to the Fricks' claim that the City interfered with the Fricks' use of the relocation site, which resulted in an inverse condemnation of that property? (Appellants' Issues I, III, and V.)*

The Fricks first contend that the district court erred in granting the City's motion for summary judgment on their claim that the City interfered with their use and development of the relocation site. The Fricks specifically argue that all reasonable access was denied in that (a) they were required to remove the Lot 3 driveways, (b) the City passed a moratorium prohibiting the construction of driveways, culverts, or other improvements within the right-of-way of the Project and on Pacific Avenue, and (c) the City failed to issue a building permit sought by the Fricks.

A. *Did the City block or take away access to the relocation site and was the required removal of dirt-fill driveways constructed by the Fricks a taking?*

First, we focus on the Fricks' complaints regarding their driveway access to the relocation site. Some of their arguments address whether there was a taking because the City removed access that existed before the Project. Other arguments focus on the removal of the Lot 3 driveways installed by the Fricks at the beginning of the Project. None of the arguments raise disputes about the law; the disputes are whether the facts support the claims.

### 1. Right of Access

This court has consistently observed that " 'right of access' is traditionally defined as an abutting landowner's common-law right of access from the landowner's property to abutting public roads." *City of Wichita v. McDonald's Corp.*, 266 Kan. 708, 718, 971 P.2d 1189 (1999); see also *Korytkowski*, 283 Kan. at 129 (same). When the government actually blocks or takes away *existing access* to and from property and an abutting road, the landowner is generally

entitled to compensation. K.S.A. 26-513(d)(15) (provides for compensation under the Kansas Eminent Domain Procedure Act, K.S.A. 26-501 *et seq.*, for damages for "loss of private roads or passageways and the cost of replacing them with private roads or passageways of like quality, to the extent that such loss affects the value of the property remaining"); *McDonald's Corp.*, 266 Kan. at 718; see *Kohn Enterprises, Inc. v. City of Overland Park*, 221 Kan. 230, 236-37, 559 P.2d 771 (1977) (upholding finding of damages for reduction in property value based on elimination of access point to abutting highway); *McCall Service Stations, Inc. v. City of Overland Park*, 215 Kan. 390, Syl. ¶ 4, 524 P.2d 1165 (1974) (landowner compensated for diminution of value when one entrance to business from abutting highway permanently closed).

The Fricks seek to apply these rules by arguing they had access from the relocation site to Pacific Avenue before the Project began, but they had "no access whatsoever" after the Project's completion. In their amended petition, they alleged that the relocation site became essentially "landlocked" with no access. In making this assertion, the Fricks focus on the two dirt driveways from Lot 3 to Pacific Avenue, installed by the Fricks, subsequently removed by the Fricks upon the request of the City, and never reinstalled by the City. Similarly, the Fricks in one of their appellate briefs, without citation to the record, state that "it is the Fricks' position that these driveways had been on the subject property for many years and were grandfathered farm access that was exempt and therefore valid under the Ordinance."

Contrary to these arguments and assertions, the uncontroverted evidence in the summary judgment record was that the Fricks had one driveway at the relocation site before the Project began, a field entrance from Pacific Avenue to Lot 1, and the entrance was reconstructed by the City (as a concrete apron) in approximately the same pre-Project location. Then the Fricks, without obtaining a permit, constructed the Lot 3 driveways in late April or early May 2005, which was at the beginning stages of the Project. Until the Fricks installed these dirt driveways from Pacific Avenue to Lot 3 during the City's construction efforts, the Fricks never had direct driveway access to Lot 3 from Pacific Avenue. Rather, they had

only indirect access to this portion of the relocation site through Lots 1 and 2. At the summary judgment stage, the Fricks failed to cite to any evidence establishing their claim that the Lot 3 driveways existed before the Project. Likewise, on appeal they fail to cite to places in the record on appeal where they supported their allegations with evidence before the district court.

Hence, the Fricks did not come forward in opposing the motion for summary judgment with evidence that creates a factual controversy regarding the taking of existing access. Consequently, we conclude there was not a compensable taking. See *Korytkowski*, 283 Kan. 122, Syl. ¶ 6 ("[W]here the landowners' property was not physically taken and access to the abutting roadway was not disturbed, the necessity of a more indirect route to and from the landowners' property did not constitute a taking under Kansas law based on either 'right of access' or 'restricted access.' "); *Teachers Insurance & Annuity Ass'n of America v. City of Wichita*, 221 Kan. 325, 335, 559 P.2d 347 (1977) ("Access may be defined as the right vested in the owner of land which adjoins a road or other highway to go and return from his own land to the road or highway without unreasonable interference. Such a right to be of any substantial utility must necessarily include the owner's invitees and licensees.").

### 2. *Driveway Removal*

The Fricks also argue that the "forced removal" of the Lot 3 driveways was a compensable taking. On appeal, they do not explain *why* the City's requiring the removal of the driveways was erroneous or amounted to a taking. They merely assert that the driveways were exempt from the City Code. In other words, they do not dispute that the City had the right to require the removal of any driveway that was constructed in violation of the City Code. Their dispute relates to whether there was a code violation and whether the only code provision at issue is the one specifically mentioned by the City in its letter demanding the removal of the driveways.

This letter was sent on May 3, 2005, shortly after the Fricks installed the Lot 3 driveways. In the letter, the City's Director of

Public Works O'Leary notified the Fricks that the construction of "the two driveway approaches on the south side of East Pacific Avenue" was in violation of "city codes including Section 35-151 involving required permits for driveway approaches."

Salina City Code Ordinance § 35-151 (2010) (enacted in 1966) provides in part that "[n]o sidewalks, driveway approaches, curbing, guttering or any other concrete work in any street or public grounds in the city shall be constructed, reconstructed or rebuilt" until a permit has been issued. Although the Fricks removed the Lot 3 driveways, they argued that City Ordinance § 35-151 did not apply because it pertains to the installation of concrete structures and the Lot 3 driveways were constructed using dirt fill.

During district court proceedings, the City asserted that the Fricks' installation of the Lot 3 driveways violated Salina City Ordinance § 35-129 (2010) (enacted in 1966). At or before the summary judgment hearing, the Fricks did not advance any arguments specific to City Ordinance § 35-129, except to point out that the City's May 3, 2005, letter requesting removal of the Lot 3 driveways did not specifically mention that particular ordinance.

In its order of summary judgment, the district court found that the Fricks violated City Ordinance § 35-129, which provides: "It shall be unlawful for any person to construct, alter or extend, or permit to cause to be constructed, altered or extended, any driveway approach which can be used only as a parking space or area between the curb and private property." On appeal, the Fricks do not dispute that the Lot 3 driveways constituted an "area between the curb and private property." Rather, they again focus on the fact the ordinance was not specifically mentioned in the May 3, 2005, letter.

They make the same argument as to yet another City Code section that the City raised for the first time on appeal—Salina City Code Ordinance § 35-128 (2010), which requires "[a]ll driveway approaches shall be paved." This requirement has also been in place since 1966. Because this section requires driveways to be paved, it triggers the permit requirements of City Ordinance § 35-151, the one City Code provision specifically referenced in the May 3 letter. The Fricks ignore this closing of the circle and the fact

that the Lot 3 driveways clearly violated one or more provisions of the City Code and continue to question whether the various provisions, including their interrelationship, can be considered when the May 3, 2005, letter only mentioned City Ordinance § 35-151.

In response to that argument, the City contends we can consider the violations of City Ordinances §§ 35-128 and 35-129 because the May 3, 2005, letter, referred broadly to "city codes," even though it gave only one specific example, City Ordinance § 35-151. According to the City, the letter accomplished its purpose by giving notice that the driveways did not conform to code requirements and that the City was enforcing its code by requiring the removal of the nonconforming structures.

As the City argues, because the facts relating to the driveways are not disputed, a question of law is presented as to whether there was a City Code violation. See *City of Wichita v. Hackett*, 275 Kan. 848, 850, 69 P.3d 621 (2003) (interpretation of municipal ordinance is question of law over which appellate courts exercise unlimited review). Further, because there is solely a question of law raised by the application of the relevant City ordinances, it can be raised for the first time on appeal. See *Pierce v. Board of County Commissioners*, 200 Kan. 74, 80-81, 434 P.2d 858 (1967). The undisputed fact that the Lot 3 driveways were entirely dirt establishes violations of the various provisions of the City Code.

As the Fricks agree, reasonable regulation of private property under the police power is not a taking and therefore does not require payment of just compensation. See *Small v. Kemp*, 240 Kan. 113, 116-17, 727 P.2d 904 (1986); see also *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 126-27, 88 L. Ed. 2d 419, 106 S. Ct. 455 (1985) ("[G]overnmental land-use regulation may under extreme circumstances amount to a 'taking' of the affected property," but the mere imposition of a permitting or regulatory process does not imply that a taking has occurred.). And the Fricks do not argue due process violations, that the City Code sections were unreasonable regulations of the use of private property, or that removal of the driveways was not an appropriate enforcement mechanism.

B. *Did the City's enactment of a moratorium ordinance prohibiting construction of driveways, culverts, or other improvements within the right-of-way of the Project and on Pacific Avenue exceed the scope of "valid police power" and result in a taking?*

In a related argument, the Fricks contend that the City's enactment of the moratorium ordinance—or "interim development control" as moratoria are often called— exceeded the scope of "valid police power." The moratorium remained in effect from May 2, 2005, until February 25, 2008, and prohibited the construction of driveways, culverts, or other improvements within the right-of-way of the Project and on Pacific Avenue. The Fricks complain that the "City exercised total control over the Frick property that [did] not allow the Fricks to develop within the 3-year period of time due to the Moratorium." The Fricks also contend that the moratorium constituted a taking in that it was directed specifically at the Fricks. These contentions lack merit.

The United States Supreme Court has identified two types of regulatory action that constitute categorical or per se takings. "First, where government requires an owner to suffer a permanent physical invasion of her property—however minor—it must provide just compensation." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538, 161 L. Ed. 2d 876, 125 S. Ct. 2074 (2005) (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 73 L. Ed. 2d 868, 102 S. Ct. 3164 [1982]). A second categorical rule applies to "regulations that completely deprive an owner of '*all* economically beneficial us[e]' " of his or her property. (Citation omitted.) *Lingle*, 544 U.S. at 538. If the facts of a governmental takings case do not fit within these two categories, then the takings claim must be analyzed under the catch-all standard promulgated in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 57 L. Ed. 2d 631, 98 S. Ct. 2646, *reh. denied* 439 U.S. 883 (1978).

The *Penn Central* factors were held to be applicable when an alleged taking is temporary in nature in *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 342, 152 L. Ed. 2d 517, 122 S. Ct. 1465 (2002). In so holding, the United States Supreme Court declined to adopt a per se categorical

test for temporary moratoriums on development. The Court noted: "A rule that required compensation for every delay in the use of property would render routine government processes prohibitively expensive or encourage hasty decisionmaking." *Tahoe-Sierra*, 535 U.S. at 335. " 'Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law.' [Citation omitted.]" *Lingle*, 544 U.S. at 538.

Hence, to determine whether the moratorium imposed in this case was a taking, we must apply the *Penn Central* standards. Those factors were defined in the context of the Court considering whether restrictions imposed by the City of New York, which prevented substantial additions to Grand Central Station, amounted to a taking. The Court noted that "[t]he question of what constitutes a 'taking' for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty" and as a result the Court was "unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons," with the result being "ad hoc, factual inquiries." *Penn Central*, 438 U.S. at 123-24. Nevertheless, citing *Goldblatt v. Hempstead*, 369 U.S. 590, 594, 8 L. Ed. 2d 130, 82 S. Ct. 987 (1962), the *Penn Central* Court identified three "factors that have particular significance:" (1) the economic impact of the regulation on the claimant, (2) the extent by which the regulation has interfered with distinct, investment-backed expectations, and (3) the character of the governmental action. Regarding the third factor, the Court observed: "A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, [citation omitted], than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central*, 438 U.S. at 124; see also *McPherson Landfill, Inc. v. Board of Shawnee County Comm'rs*, 274 Kan. 303, 332-34, 49 P.3d 522 (2002) (discussing *Penn Central*).

The analysis of the *Penn Central* factors must focus on the "parcel as a whole," not discrete segments. *Penn Central*, 438 U.S. at

130-31. It is insufficient to establish a taking " 'by showing that [the landowner has] been denied the ability to exploit a property interest that [it] heretofore had believed was available for development.' " *Mount St. Scholastica v. City of Atchison, Kansas*, 482 F. Supp. 2d 1281, 1298 (D. Kan. 2007) (quoting *Penn Central*, 438 U.S. at 130).

Explaining the rationale of *Penn Central*, this court has indicated that "[w]here the government reasonably concludes that the health, safety, morals, or general welfare would be promoted by prohibiting particular contemplated uses of land, compensation need not accompany a reasonable prohibition. [Citations omitted.]" *Garrett v. City of Topeka*, 259 Kan. 896, 916, 916 P.2d 21 (1996). As more specifically relevant to the circumstances of this case, we have held that the private rights of an abutting landowner on an existing street or highway are subordinate to the right of the public to proper use of the street or highway, so that the exercise of rights of abutting landowners is subject to reasonable regulation and restriction for the purpose of providing reasonably safe passage for the public. But regulations or limitations cannot be sustained which unduly or unreasonably curtail or restrict rights of an abutting landowner. *Smith v. State Highway Commission*, 185 Kan. 445, 452, 346 P.2d 259 (1959).

In the present case, the district court applied the *Penn Central* factors and held that the moratorium passed by the City was a reasonable police power. The court observed that the moratorium was limited to the time of construction and establishment of new traffic patterns. In addition, it applied to the entire construction area. And during the time the moratorium was in effect, the Fricks began submitting building development plans. As for the Fricks' contention that the moratorium was directed specifically at them, the district court stated:

"The moratorium may have been discussed and passed following the plaintiffs' installation of culvert driveways, but there is no language in the moratorium nor are there any controverted material facts to indicate it affected the plaintiffs in a special or particular manner different from the other property owners in the construction area."

In other words, the Fricks' installation of the Lot 3 driveways acted merely as a catalyst for the City's taking action.

Examining the *Penn Central* factors, we cannot conclude that the moratorium resulted in a compensable taking of the Fricks' relocation site. As for the first two *Penn Central* factors—the economic impact of the regulation and the impact on investment-backed expectations of the owner—the City points out that the subject property had previously been used for agricultural purposes and continued to be used for agricultural purposes throughout the period in which the moratorium remained effective.

The Fricks respond that "[t]his moratorium was in place for the entire period of time the Fricks were attempting to relocate. This moratorium cost the Fricks [a] $175,000.00 tax credit, issued under I.R.S. Code § 1033." Internal Revenue Code (I.R.C.) § 1033, see 26 U.S.C. § 1033 (2006), provides that a condemnee is taxed on the full gain it realizes on a condemnation award unless it reinvests the condemnation proceeds within a certain period of time. See *Baylin v. United States*, 30 Cl. Ct. 248, 251 (1993). The Fricks supported this assertion and calculation with the deposition testimony of their tax expert David Rettele, in which he opined that the Fricks had to reinvest any gains within 3 years from the time of the condemnation of 1056 E. Pacific Avenue. According to Rettele, the start of the 3-year period was sometime between August 2003 and November 2004.

The City points out that this tax consequence and the loss of any investment-backed expectations in the development of the relocation site is "directly attributable to the Fricks' refusal to comply with the City's building permit application requirements." The essence of the City's argument is that the driveway moratorium did not prevent the Fricks from reinvesting, either on the relocation site after acquiring a building permit or on other property if they eventually were unable to obtain a permit to build on the relocation site. As will be more fully discussed in the next issue, while the moratorium was in effect, the City was participating in ongoing communications with the Fricks regarding the potential development of the relocation site. Despite this fact, the Fricks never submitted a completed application. Consequently, it was not the drive-

way moratorium but the failure to obtain a building permit that prevented the investment of the proceeds into the development of the relocation site; the moratorium itself did not interfere with the Fricks' building application process.

Further, if there was any effect on economic viability by temporarily disallowing the installation of driveways, the economic viability of the relocation site was delayed, rather than destroyed. Delaying the sale or development of property during the governmental decision-making process may cause fluctuations in value that, absent extraordinary delay, are incidents of ownership rather than compensable takings. *Agins v. Tiburon*, 447 U.S. 255, 263 n.9, 65 L. Ed. 2d 106, 100 S. Ct. 2138 (1980), *overruled on other grounds Lingle*, 544 U.S. 528 (2005).

In arguing that the delay was a taking, the Fricks cite two cases from other jurisdictions, *Robins v. Town of Hillsborough*, 361 N.C. 193, 639 S.E.2d 421 (2007), and *State ex rel. Hilltop Basic v. Cincinnati*, 167 Ohio App. 3d 798, 857 N.E.2d 612 (2006). Neither case is particularly helpful.

In *Robins*, the town Board adopted a moratorium temporarily suspending the review, consideration, and issuance of permits and applications for manufacturing and processing operations involving petroleum products. Before the moratorium took effect, the plaintiff had submitted an application seeking approval of his site-specific development plan, in which he proposed to construct an asphalt plant on the property. At the time the moratorium took effect, the plaintiff's asphalt plant was the only development plan under consideration by the Board which was affected.

The North Carolina Supreme Court held that by enacting the moratorium, the town had not followed its own rules and ordinances requiring the Board to approve or deny the application. It effectively usurped the Board's responsibility in the matter. Thus, the plaintiff was entitled to have his application reviewed under the ordinances and procedural rules in effect at the time he filed his application. *Robins*, 361 N.C. at 199.

In contrast, the Fricks did not have a pending permit application for the construction of a building or driveways at the time the moratorium was passed. It is significant that the City's basis for

requiring the removal of the Lot 3 driveways was that the Fricks had failed to obtain a permit or otherwise comply with already enacted City Code provisions, specifically with City Code provisions that had been in effect since 1966.

In *Hilltop Basic*, the City of Cincinnati denied access to a piece of property, leaving it landlocked so that the only access would be by boat. The Ohio Court of Appeals held that the City's denial of the landowners' application for a curb-cut/driveway permit for access to the public road, which denial made the undeveloped riverfront property inaccessible from the land, constituted a taking. See *Hilltop Basic*, 167 Ohio App. 3d at 806-09. Our case is distinguishable from *Hilltop Basic* in that the Fricks continued to enjoy the same access to the relocation site as they had prior to the Project—the access driveway on Lot 1.

More similar to this case are the several cases recognizing that comparable moratoria are widely used among land-use planners to preserve the status quo while formulating more permanent development strategies and which find such moratoria are not takings. See, *e.g.*, *Santa Fe Village Venture v. City of Albuquerque*, 914 F. Supp. 478, 483 (D. N.M. 1995) (30-month moratorium on development of lands within the Petroglyph National Monument was not a taking); *Zilber v. Town of Moraga*, 692 F. Supp. 1195, 1206-07 (N.D. Cal. 1988) (18-month development moratorium during completion of a comprehensive scheme for open space did not require compensation); *Williams v. City of Central*, 907 P.2d 701, 703-05 (Colo. App. 1995) (10-month moratorium on development in gaming district while studying city's ability to absorb growth was not a compensable taking); *Woodbury Place Partners v. Woodbury*, 492 N.W.2d 258, 262 (Minn. App. 1992), *cert. denied* 508 U.S. 960 (1993) (moratorium pending review of plan for land adjacent to interstate highway was not a taking even though it deprived property owner of all economically viable use of its property for 2 years); *Nolen v. Newtown Tp.*, 854 A.2d 705, 707-10 (Pa. Commw. 2004) (2-year moratorium on development was not a taking because there were other uses available, including farming, that were not affected by the moratorium); see also *Riviera Drilling and Exploration Co.*,

*Inc. v. United States*, 61 Cl. Ct. 395, 404-05 (2004) (6-month delay in issuing permit not a taking).

In these cases, the reasonableness of the delay is often dependent on the reason for the moratorium. This consideration is closely tied to the third *Penn Central* factor—the character of the government action. Here, the City argues that the moratorium was enacted to promote the common good. As stated in the City Council's resolution, the purpose of the moratorium was (1) traffic safety, (2) the need to avoid costs to the public due to delays caused by conflicts with private construction or because of the need to remove private improvements in conflict with the Project's construction, and (3) the need to avoid economic loss to private parties in the event such improvements had to be removed in order to complete the Project. Further, the moratorium was limited to the construction or installation of driveways, culverts, or other improvements within the confines of the Project and within the right-of-way. It did not restrict development of adjacent private property outside the boundaries of the right-of-way. These factors lead us to conclude the moratorium was facially reasonable.

Nevertheless, the Fricks contend that the moratorium was discriminatory and made in bad faith because it was specifically directed at them. They cite no evidentiary support for this contention, however. Rather, they merely claim that "Mr. [Bengtson]'s statements confirm this." The Fricks offer no explanation for what these statements were, nor do they offer any citation to the record. Our review of the record finds no support for the Fricks' assertion. Our review did discover that Greg Bengtson, one of the attorneys representing the City at the summary judgment hearing, argued there that the moratorium was "not directed uniquely to the Fricks." Recognizing that the situation involving the Fricks' Lot 3 driveways created a "wake-up call" due to the "magnitude and effect of the [P]roject on that vicinity," Bengtson argued the City found it was necessary "to the overall project" that there would be "no circumstance under which a [driveway] permit during this particular time would be warranted administratively . . . whether it was the Frick property or any of the other properties in the vicinity . . . that were affected by the moratorium."

These statements do not support the Fricks' arguments. More importantly, the statements are not evidence and do not satisfy Supreme Court Rule 141 (2009 Kan. Ct. R. Annot. 225). The uncontroverted facts are that the Project included the property of landowners other than the Fricks and that the moratorium applied to all properties in the Project area, facilitated a public purpose, and existed for a reasonable length of time corresponding to the Project period and the establishment of traffic flow in the area. The public safety, general welfare, and economic concerns associated with the moratorium constituted reasonable regulation by the City. The implementation of the moratorium did not result in a taking.

C. *Did the City's failure to issue a building permit to the Fricks constitute a taking?*

The moratorium issue ties into the Fricks' next contention that the City's failure to issue a building permit constituted a taking. The Fricks essentially assert that the City's failure to issue a building permit is a taking of property without payment of just compensation or without having afforded rights of due process.

As previously noted, it is generally recognized that the mere imposition of a permitting or regulatory process does not imply that a taking has occurred. It is only "under extreme circumstances [that a land use regulation will] amount to a 'taking' of the affected property." *Riverside Bayview Homes*, 474 U.S. at 126. The City argues this situation cannot be considered such a circumstance because a completed building permit application was never submitted. The City further argues the issue is not ripe because a permit has never been denied.

1. *Ripeness*

We will first focus on the question of whether the takings claim is ripe given that that there has never been a denial of a building permit. As the Federal Circuit Court of Appeals has stated: "[T]he initial denial of a permit is still a necessary trigger for a ripe takings claim. If the government denies a permit, then the aggrieved party can seek compensation." *Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1347 (Fed. Cir. 2002), *cert. denied* 538 U.S. 906 (2003).

The City's position that this issue is not ripe because there has not been a "final decision" with regard to a building permit is further supported by *Mid Gulf, Inc. v. Bishop*, 792 F. Supp. 1205 (D. Kan. 1992).

In *Mid Gulf*, the property owner sued the City of Lansing, Kansas, and certain municipal officers, alleging damages for civil rights violations, prima facie tort, and inverse condemnation arising out of the denial of a building permit and the denial of a conditional use permit for drilling for oil and gas within the city limits. The federal district court held that the property owner's inverse condemnation and substantive due process claims were not ripe for review where there had been no determination by the city of what level of development would finally be allowed on the property, the parties were currently involved in state court litigation regarding whether the property would be annexed as part of the city, and it was still entirely possible that the property owner would be allowed to develop the subdivision as originally planned. *Mid Gulf*, 792 F. Supp. at 1209-10; *cf. Shaner v. Perry Tp.*, 775 A.2d 887, 892-93 (Pa. Commw. 2001) (regulatory taking shown where township refused to issue landowner a permit to use land in a commercial district in any way whatsoever, including uses expressly permitted in the commercial district).

The same conclusions apply here. It is still entirely possible that the Fricks' planned development of the relocation site would be approved. They simply must comply with the application requirements in order for the application to be considered by the City. As found by the district court in its order of summary judgment, "the City stands ready and willing to review and consider any complete building application from plaintiffs. This would include identified driveway locations and configurations."

### 2. *Extraordinary Circumstances*

There are exceptions to the ripeness requirement, however. In a footnote, the Federal Circuit pointed out two, stating: "An extraordinary delay in permit processing or bad faith on the part of the agency can give rise to a ripe takings claim notwithstanding the failure to deny the permit. [Citation omitted.]" *Boise Cascade*

*Corp.*, 296 F.3d at 1347 n.6. The Fricks make arguments relating to both exceptions. Specifically, they argue that they submitted the necessary documents but the City delayed issuing a permit and that "[t]here was a building permit denial by [the City's] constantly adding new requirements."

The Fricks cite several cases where one or the other of these exceptions was found to apply. See, *e.g., Urbanizadora Versalles, Inc. v. Rivera Rios*, 701 F.2d 993, 996-97 (1st Cir. 1983) (freezing of property owner's land for 14 years by reserving land for future public improvements or condemnation, without actually condemning land, amounted to unconstitutional deprivation of property); *Q.C. Const. Co., Inc. v. Gallo*, 649 F. Supp. 1331, 1335 (D. R.I. 1986) (moratorium on construction declared by town council resulted in taking of developer's property without due process of law, as it was constitutionally inappropriate response to problem with inadequate sewer line); *Eaton v. City of Solon*, 598 F. Supp. 1505, 1512 (N.D. Ohio 1984) (in civil rights action seeking money damages, unreasonable delay by governmental agencies or state actors, in and of itself, is a constitutional violation; there are no lawful reasons for delays not related to legitimate, governmental purpose or function and hearings must be granted at a meaningful time and in a meaningful manner).

Relying on these cases, the Fricks argue the City unreasonably delayed issuing a permit. In responding to the City's motion for summary judgment and its statement of fact that a completed building permit application had not been submitted, the Fricks provided record citations to evidence from two witnesses, City employees O'Leary and Lange. Relating to O'Leary, the Fricks cited to page 18 of O'Leary's deposition. We are hindered in our review of this evidence because we cannot find an exhibit that is clearly identified as page 18 of that deposition, and the Fricks have not provided a citation to the record on appeal. Our review of the summary judgment documents revealed an unidentified attachment to the Fricks' summary judgment response that clearly is a page from a deposition and is numbered "18." We assume this page is the referenced exhibit. The first several lines of the page address the moratorium. Then, the witness is asked if "applications

for building permits" had been submitted by the Fricks. The witness answered, "Yes." The witness was then asked to explain "what that application entailed." The witness answered, "It was a long, protracted matter, but I will do my best here. My recollection is it was an application for a shell building on that easternmost parcel." However, the witness does not state that a *complete* application was ever submitted.

This distinction and the importance of this distinction is revealed by the other record citations given by the Fricks, Lange's affidavit and her April 21, 2006, letter. This letter acknowledged the submission of an application and recognized the change in the request for a shell building permit. However, the primary focus of the letter was identification of the items missing from the request. The letter noted the submittal was "incomplete and does not allow staff to begin a building permit plan review." In other words, the Fricks' Rule 141 citations to the record did not controvert the fact that a completed permit application was never submitted.

Moreover, before the district court, the Fricks did not cite to evidence establishing that the City continued to add requirements. Rather, the uncontroverted facts show that the City explained what had to be submitted with the application for a building permit and merely persisted in the demand that everything be submitted. In fact, after the Fricks changed their request from the restaurant/bar permit to a shell building permit, the City in Lange's lengthy April 21, 2006, letter outlined the differences in the requirements for each and explained with specificity what needed to be provided. Lange stated: "Your application describes the work as a shell building, and that representation is a key component of the review you have requested by the City." The letter continued:

"Please modify your submittal documents to include the following information in addition to the information provided on March 20, 2006 and April 19, 2006 to complete your submittal:

"• Survey
    "• Provide the legal description and survey of the zoning lot (the legally described area for which a permit is being requested). This description must include any improved areas on the site such as the parking lot.
    "• Identify the parcel area in square feet.

"• Site Plan—Reference Salina City Code Section 42-412

"• Identify driveway locations and proposed driveway configurations with respect to the newly constructed Pacific Avenue.

"• Show the existing field entrance/driveway relative to the proposed driveways.

"• Identify any existing and proposed utilities within and adjacent to the site plan. *Please show the existing public water line as currently located adjacent to the site and proposed plans to connect private service lines or private fire lines for the proposed new building.*

"• Identify the proposed drainage plan in addition to existing contours or elevations. The drainage plan should include culvert sizes, lengths and materials under driveways. *Please reference City Driveway Standards and City Storm Drainage Design Criteria.*

"• Identify the name, address and phone number of the applicant.

"Once your permit submittal has been determined complete, plan review will begin. City staff has set a performance goal of completing an initial plan review in 10 working days. At the end of 10 working days, you will receive either a plan review letter with corrections noted or a building permit."

The letter also answered a large list of questions previously submitted by the Fricks, involving requirements for zoning certification, architectural drawings, water service drawings, sewer service drawings, electrical drawings, mechanical drawings, equipment drawings, door hardware schedule, food service establishment plans and approvals, parking lot design, fire protection plans, fire alarm drawings, utility plans, survey, site plan, code footprint, and phases of permits issued. Because submittal requirements, review, and approval would vary significantly depending on the occupancy classification (restaurant/bar building versus cold storage building), Lange's responses to the Fricks' questions included distinctions between the requirements of each classification.

According to Lange's affidavit, correspondence continued between the City and the Fricks for the next few months. Then, at a meeting on June 7, 2006, at which the Fricks, representatives of the City, and counsel for both sides were present, the parties discussed and clarified the *deficiencies* in the Fricks' previous submittals. The Fricks fail to show how any of the cited problems were new requirements.

At that meeting and upon the request of the Fricks, Lange returned the bulk of their previous permit application submittals,

retaining for the City's records only one copy of the March 20, 2006, submittal. Lange's affidavit further indicated that on January 18, 2007, the Fricks submitted more documentation in reference to their original application, but in its response, the City indicated its understanding that the original submittals were "no longer current or applicable; that the Fricks had withdrawn their original application submittals; and that the Fricks would need to submit a complete set of the required building permit application documents before any plan review could begin." Lange averred that her employment with the City ended on February 6, 2008, and from January 2007 until February 2008, there had been no significant correspondence between the City and the Fricks with regard to their building permit application.

Even Robert Chapman, expert for the Fricks and former building inspector for the City of Raytown, Missouri, acknowledged in his deposition that the Fricks had not submitted all of the information requested by the City. During Mr. Frick's deposition, he acknowledged that even after modifying the application to one seeking to obtain a permit for a shell building, he failed to submit all the information requested by the City because "we couldn't get that accomplished." Further, he acknowledged that the code footprint submitted by the Fricks was incomplete. When asked whether he had submitted the information required by the City regarding culvert sizes, lengths, or materials under the proposed driveways, Frick replied that such information "wasn't necessary." Frick's deposition is replete with instances where he did not believe all of the City's requirements should apply to him. For example, when asked, "If this is what the City is telling you [that] you need to do to obtain a building permit, why didn't you do it?," Frick replied, "I guess it's not possible because my—my people couldn't do it." Frick could not point to any point in time when he had submitted a complete building permit application or provided a completed application.

Hence, the uncontroverted evidence is that the delay was not caused by the City but by the Fricks' failure to submit a completed application. The district court correctly determined that the Fricks have alleged no controverted facts establishing a taking because of

the City's actions on the Fricks' building permit application and no ripeness exceptions apply.

ISSUE 2: *Did the district court err in granting the City's motion for summary judgment with respect to the Fricks' inverse condemnation claims involving (1) property damage allegedly caused by contractors working on the City's Project and (2) flooding and drainage problems allegedly caused by the Project's road realignments? (Appellants' Issues II and VI.)*

Next, the Fricks contend that the district court erred in granting the City's motion for summary judgment with respect to the Fricks' inverse condemnation claims involving (1) property damage allegedly caused by contractors working on the City's Project and (2) flooding and drainage problems allegedly caused by road realignments completed for the Project.

With respect to the property damage claim, the Fricks alleged that the contractors drove onto their property during construction efforts on the Project and caused damage such as trampling crops, creating tire tracks, displacing gravel, and leaving "construction debris" on the property.

Relying on *Kau Kau Take Home No. 1 v. City of Wichita*, 281 Kan. 1185, 1190, 135 P.3d 1221 (2006), *cert. denied* 549 U.S. 1265 (2007), *overruled in part and disapproved in Estate of Kirkpatrick v. City of Olathe*, 289 Kan. 554, 567-68, 215 P.3d 561 (2009) (citing, discussing, and applying K.S.A. 26-513[a]), the district court found that the Fricks failed to state a cause of action for inverse condemnation in that they "failed to allege any controverted facts that would establish that any damage caused by contractors was necessary to complete the road project." In *Kau Kau*, this court held that damage to private property caused by contractors working on a public road construction project did not support a cause of action for inverse condemnation when the damage was not "necessary" to complete the road construction project and, instead, the landowners' claim sounded in tort. 281 Kan. at 1190.

With respect to the flooding and drainage claim, the Fricks alleged that "[a]fter completion of the Ohio Street Overpass project, the Plaintiffs' property has been inundated by storm water drain-

age, water retention, water flowage, water drainage, impounding of water and release of water." They further alleged that the business records of the design and construction company "clearly establish that the City of Salina intended to use the subject property of the Fricks for the purpose of storm water drainage, water retention, water flowage, water drainage, impounding of water and release of water." Because of these flooding and drainage problems, argued the Fricks, they would be unable to farm their property or to commercially develop it.

Relying on *Estate of Kirkpatrick v. City of Olathe*, 39 Kan. App. 2d 162, 178 P.3d 667 (2008) (*Kirkpatrick I*), *rev'd Estate of Kirkpatrick*, 289 Kan. 554 (*Kirkpatrick II*), the district court made essentially the same finding that it made regarding the Fricks' other property damage claim: "The plaintiffs have also not presented any controverted facts to establish that any flooding or water retention problems after the road construction were necessary to the completion of the Overpass Project." Consequently, the court concluded that the Fricks failed to state a cause of action for inverse condemnation.

In *Kirkpatrick I*, 39 Kan. App. 2d 162, Syl. ¶ 5, the Court of Appeals followed the rationale in *Kau Kau*, that mere damage to an adjoining property is not a compensable taking unless the damage was "necessary" to the completion of the public use project. The homeowner's basement was allegedly damaged due to the diversion of water when the City of Olathe constructed a roundabout at the road intersection, excavating the land and changing the grade. The Court of Appeals concluded that because the diversion of water was not necessary to the completion of the city's project, there was no compensable taking of the adjoining homeowner's property. *Kirkpatrick I*, 39 Kan. App. 2d at 169.

Subsequent to the district court's decision in the Fricks' case, we granted review of *Kirkpatrick I*. In doing so, we revisited the discrepancy between the rationale of Kansas case law, which has held that damage is only compensable if it is "necessary" to the completion of such a project, and the Kansas Eminent Domain Procedure Act (EDPA), K.S.A. 26-501 *et seq.*, which recognizes

that a compensable taking includes "property damaged" during the course of a public improvement project.

In *Kirkpatrick II*, 289 Kan. at 559, this court observed that K.S.A. 26-513(a), which defines the actions for which compensation is required under Kansas eminent domain law, states: " 'Private property shall not be taken *or damaged* for public use without just compensation.' " (Emphasis added.) This language has remained unchanged since the EDPA's original enactment in 1963. See L. 1963, ch. 234, sec. 13. "Under the plain language of the statute, compensation is required for both physical takings of property interests and 'damage' to private property that results from a public improvement project." *Kirkpatrick II*, 289 Kan. at 559.

The remainder of K.S.A. 26-513 contemplates that damage to private property resulting from a public improvement project may require compensation under Kansas law. Most notably, K.S.A. 26-513(d) provides a nonexclusive list of factors that should be taken into consideration when determining the compensation that is due to a landowner. The *Kirkpatrick II* court observed that among other items listed, the statute includes: "[l]oss of trees and shrubbery"; "[c]ost of new fences or loss of fences and the cost of replacing them with new fences of like quality"; "[d]amage to property abutting on a right-of-way due to change of grade"; "[l]oss of or damage to growing crops"; and "[c]ost of new drains or loss of drains and the cost of replacing them with drains of like quality." K.S.A. 26-513(d)(7), (8), (10), (12), and (14). In these instances, the requirement for compensation arises not from a physical taking of the land but rather from damage to the property that "affects the value of the property remaining" after the government action. See K.S.A. 26-513(d)(7), (8), and (14); *Kirkpatrick II*, 289 Kan. at 560.

The *Kirkpatrick II* court further noted that the statutory recognition that compensation may be required for damage to property—in the absence of a physical taking—is consistent with decisions of the United States Supreme Court, which hold that compensation under the Fifth Amendment to the United States Constitution must be provided for damage to property that·is the " 'direct result' of the governmental authority's action and 'consti-

tute[s] an actual, permanent invasion of the land.' " *Kirkpatrick II*, 289 Kan. at 560 (quoting *Sanguinetti v. United States*, 264 U.S. 146, 149, 68 L. Ed. 608, 44 S. Ct. 264 [1924]).

This court stated that previous Kansas cases making the conclusion that compensation is only required where a transfer of property rights has occurred or where property damage is needed to complete a public improvement project was not based on the language of the EDPA. Rather, the definition originated from this court's case law predating the adoption of the eminent domain statutes. *Kirkpatrick II*, 289 Kan. at 561.

We found it significant that in 1963, the Kansas Legislature adopted the EDPA, including K.S.A. 26-513(a), requiring compensation for property taken *or* damaged (not merely taken *and* damaged), which illustrates the legislature's intent to adopt a broader definition of eminent domain. *Kirkpatrick II*, 289 Kan. at 563. The previous Kansas appellate courts' "disregard for the EDPA provisions," stated the *Kirpatrick II* court, "has led to legal acrobatics in many of our recent inverse condemnation decisions." *Kirkpatrick II*, 289 Kan. at 565.

Hence, this court denounced the previously utilized rationale of cases requiring that the damage be "necessary" to completion of a project and stated: "In order to give full effect to K.S.A. 26-513 and the other provisions of the EDPA, *we disapprove* of our prior case law that fails to take into account the statutory requirement that just compensation be provided for property *damaged for public use*." (Emphasis added.) *Kirkpatrick II*, 289 Kan. at 568. Nevertheless, consequential or tangential damages are not compensable. *Kirkpatrick II* clarified that in order for damage to real estate to be compensable under the EDPA, that "damage must be substantial and must be the planned or inevitable result of government action undertaken for public benefit." *Kirkpatrick II*, 289 Kan. at 569.

The *Kirkpatrick II* court concluded that substantial evidence supported the district court's finding that the damage to the homeowner's property was the direct result of the City's actions in constructing a roundabout adjacent to the property and the City was aware of the alteration of the groundwater flow but took no action

to remedy the change. Reversing the Court of Appeals' decision, this court held that because the substantial damage to the homeowner's property was the inevitable result of the change in groundwater level, the damage was compensable in an inverse condemnation action. *Kirkpatrick II*, 289 Kan. at 570-71.

As a result of the *Kirkpatrick II* decision, the rationale relied on by the district court in this case is no longer valid. Despite that, the City argues the same result is justified because of the lack of evidence that the Project caused any damage. In making this argument, the City does not dispute, applying *Kirkpatrick II*, that the Fricks' damage claims fit under the statutory language of K.S.A. 26-513. Indeed, in its nonexclusive list of factors to be considered, K.S.A. 26-513 includes "[d]amage to property abutting on a right-of-way due to change of grade where accompanied by a taking of land"; "[l]oss of or damage to growing crops"; and "[c]ost of new drains or loss of drains and the cost of replacing them with drains of like quality, to the extent that such loss affects the value of the property remaining." K.S.A. 26-513(d)(10), (12), (14). We do note, however, that the factors "are not to be considered as separate items of damages, but are to be considered only as they affect the total compensation and damage[s]." K.S.A. 26-513(d). Thus, although the Fricks listed the two categories of property damage in separate counts, they should have been combined into one takings claim.

Nevertheless, as the City argues, the Fricks "did not provide a single piece of evidence substantiating their claim the contractors entered and damaged their property. In all likelihood, the Fricks have mistaken the public right-of-way as their property." The closest the Fricks came is in their reply to the City's motion for summary judgment, in which they presented additional statements of uncontroverted facts. In statement of fact No. 5, they stated, *inter alia*, that the City's contractor "damaged the parking areas of the Plaintiffs Ben and LaVelle Frick's property by turning vehicles around on their property without permission." The statement also contained allegations that the contractor prevented access to the relocation site. To support the statements, the Fricks cited to the record as follows: "See Exhibit 15 Wilson Engineering maps from

File 65—WCEA File No. X2-41-014." However, the referenced maps did not provide any evidence that there was any trespassing or damage to the property as a result. Rather, the maps illustrated the design plan. Hence, the statements are not supported by the summary judgment record as required by Rule 141 (2009 Kan. Ct. R. Annot. 225). On appeal, the Fricks do not cite to any other evidence in the record on appeal.

Similarly, the City contends that the Fricks failed to adequately substantiate their claim that the City, in redesigning the roads adjacent to the Fricks' relocation site, caused flooding on the Fricks' property. On the other hand, the City supported its motion for summary judgment with the affidavit of Timothy Miles, a professional civil engineer for Wilson & Company, Inc., the construction company hired by the City to design and engineer the improvements associated with the City's Project. In his affidavit, Miles averred:

"4. . . . . There were existing and ongoing drainage problems in this area prior to the initiation of the N. Ohio Overpass Project. The existing drainage problems were not the result of the N. Ohio Overpass Improvements. *The project plans demonstrate this fact.*

"5. . . . . This area retains water until it reaches a certain depth, at which point it flows north through a drainage structure under Pacific Avenue to nearby drainage facilities.

"6. Based on the existing and new cross section elevations in the project plans, the existing ditch on the south side of Mr. Frick's property is at the same (or lower) elevation in most places as it was before the project. . . . Therefore, these ditches had to have retained water prior to the project.

"7. The cross sections show that none of the new ditches south of Pacific Avenue inhibit water from leaving Plaintiffs' field and entering the roadway ditch. . . . The new ditches either match the existing width or are wider than the existing ditches. Therefore, the new ditches have a greater retention capacity than the existing ditches. Any water ponding in Plaintiffs' crops field is a direct result of the existing drainage problems on this property, not this project.

"8. The new pipe across Pacific Avenue . . . was designed to handle a 25-year storm and has a considerable higher capacity than the reinforced concrete box culvert it replaced. This new pipe has a 7.0 square foot opening compared to the 4.0 square foot opening of the existing structure.

"9. The drainage area that gets to this pipe is also smaller now as a result of other drainage changes along Pacific Court [*sic*]. Before this project, most of the drainage from the businesses east of Plaintiffs' property to Ohio Street and south

of Pacific Avenue drained back west to the reinforced concrete box culvert. Now, the east entrance of ADM milling is the break point. Everything east of this entrance drains to the detention pond instead of to this pipe.

"10. For the aforementioned reasons, the drainage conditions in front of and affecting Mr. Frick's property can only be characterized as improved, as a result of the project." (Emphasis added.)

A review of the record reveals that the Fricks replied to the City's statements of fact that incorporated this affidavit by stating the facts were "controverted." In addition, in their reply to the motion for summary judgment, the Fricks added several statements relating to the flooding. In all instances, the Fricks described retention of water on the relocation site and stated that the City diverted storm water onto the property, made changes to the ground elevation, changes to "drainage ditch flow," installed drainage culverts "with inadequate areas to receive the run off from the culverts," and eliminated existing culverts. For support, the Fricks cited to Miles' affidavit and the engineering maps of Miles' employer, Wilson & Company, Inc. According to the Fricks, these maps depicted water flowing through the Fricks' property to the drainage culvert in front of Lot 3 and showed holding ponds in the area where the Fricks' replacement building was to be constructed. Contrary to these assertions, however, Miles explained in his affidavit that these project plans showed the drainage problems that existed prior to the Project. Apparently recognizing this, the Fricks also argued that the runoff water design did not flow as proposed by drawings and, instead, created "worse flooding after the construction of the [Project] at the end of Pacific Avenue than before the construction." However, the Fricks did not support this statement with any evidence.

Once again, as we review the state of the summary judgment record, the City presented evidence that the Project improved the drainage, and the Fricks do not cite to any other portion of the record that supports their viewpoint. Once again, the Fricks have failed to provide Rule 141-compliant support for their assertions. Summary judgment was appropriate, therefore, although on different grounds than entered by the district court. See *Robbins v. City of Wichita*, 285 Kan. 455, 472, 172 P.3d 1187 (2007) (district

court's decision may be upheld even though it relied on wrong ground).

ISSUE 3: *Does the City's alleged "intentional pattern of behavior" result in a compensable taking of the Fricks' property? (Appellants' Issue VII.)*

The final issue presented by the Fricks is whether the City's alleged "intentional pattern of behavior" results in a compensable taking of their relocation site. They contend that "if you combined all the actions alleged in the 6 counts [of the amended petition] there is an overall accumulative taking of property requiring compensation." This "totality of the circumstances" or "cumulative error" type of approach fails in that we have not found support in the record for a taking on any one of the counts. Hence, there is nothing to accumulate. See *State v. Nguyen*, 285 Kan. 418, 437, 172 P.3d 1165 (2007) (even one error is insufficient to support reversal under the cumulative effect rule).

Affirmed.

DAVIS, C.J. and NUSS, J., not participating.

GLENN D. SCHIFFNER, District Judge, and LARSON, S.J., assigned.